CLERK'S OFFICE U.S. DIST. COURT
AT HARRISONBURG, VA
FILED

7/23/2020

JULIA C. DUDLEY, CLERK
BY: s/ J. Vasquez

DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## HARRISONBURG DIVISION

| | |
|---|---|
| **GERALD FORSBURG** § | |
| § | |
| **on behalf of himself and all** § | |
| **others similarly situated,** § | |
| § | **CAUSE NO.** 5:20-cv-00046 |
| **Plaintiff,** § | |
| § | |
| **v.** § | |
| § | |
| **WELLS FARGO & CO.,** § | |
| § | |
| **WELLS FARGO BANK, N.A.,** § | |
| § | |
| **Defendants.** § | |

## PLAINTIFF'S ORIGINAL CLASS ACTION COMPLAINT
## AND APPLICATION FOR INJUNCTIVE RELIEF

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiff Gerald Forsburg, on behalf of himself and all others similarly situated, files this original class action complaint against Defendants Wells Fargo & Co. and Wells Fargo Bank, N.A. (referred to herein together with Wells Fargo & Co., as "Wells Fargo"), seeking relief for Plaintiff and all other similarly situated consumer borrowers in the Western District of Virginia and elsewhere nationwide, who have been subjected to Defendants' unlawful practice of placing its customers' mortgage loans into unwanted and harmful "forbearance" status.

## I. PARTIES

**Plaintiff:**

1.      Plaintiff Gerald Forsburg owns a home in located in Mount Jackson, Virginia.  Mr. Forsburg's property is encumbered by a lien securing repayment of a federally-related and federally guaranteed loan backed by the Fair Housing Administration ("FHA"), which loan is serviced by Wells Fargo.

**Defendants:**

2.     Defendant Wells Fargo & Co. is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments, mortgage banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in other countries.

3.     According to a December 2019 Wells Fargo company presentation, as of September 2019, Wells Fargo was the largest mortgage servicer in the country, servicing 8.2 million loans totaling $1.4 trillion dollars in unpaid balances.

4.     Wells Fargo & Co. is the parent corporation of Defendant Wells Fargo Bank, N.A. Wells Fargo & Co. exercises specific and financial control over the operations of Defendant Wells Fargo Bank, N.A., dictates the policies, procedures, and practices of Wells Fargo Bank N.A., exercises power and control over the specific activities upon which the claims herein are based, and is the ultimate recipient of the ill-gotten gains described herein. Wells Fargo & Co. represents on its website that it controls and sets the standard for its loan servicing business, stating that:

> Wells Fargo & Company Responsible Servicing Principles for U.S. Residential Real Estate Lending . . . Wells Fargo's vision to satisfy all our customers' financial needs . . . Similarly, we have long adhered to [] responsible servicing practices. . . .

5.     Defendant Wells Fargo & Co. may be served with process through its registered agent, CSC – Lawyers Incorporating Service, at 2710 Gateway Oaks Dr., Suite 150N, Sacramento, CA 95833.

6.     Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Co. Wells Fargo Bank, N.A. is a national association that is headquartered in South Dakota and may be served with process through its registered agent, Corporation Service Company, at 327 Hillsborough

Street, Raleigh, North Carolina 27603. Wells Fargo Bank, N.A. can also be served via certified mail through Michael V. Bradford, President, at 101 North Phillips Avenue Sioux Falls, SD 57104.

7.     Wells Fargo Bank, N.A. conducts mortgage servicing operations through its Wells Fargo Home Mortgage division, which is headquartered in Des Moines, Iowa. Plaintiff's mortgage loan is currently serviced by Wells Fargo Bank, N.A.

## II.  JURISDICTION AND VENUE

8.     The Court has jurisdiction over the lawsuit because the suit arises under under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud), the Truth in Lending Act ("TILA"), as implemented through Regulation Z, and the Real Estate Settlement Procedures Act ("RESPA"), as implemented through Regulation X.

9.     The Court also has jurisdiction over the lawsuit under 28 U.S.C. § 1332(d), the Class Action Fairness Act, because the suit is a class action, the parties are minimally diverse, and the amont in controversy exceeds $5 million, excluding interest and costs.

10.     The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's common law claims against Wells Fargo because Plaintiff's non-statutory claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.

11.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the property securing Plaintiff Forsburg's loan at issue in this case, which is Forsburg's real property, is located in this district.

## III.  FACTS

12.     Plaintiff files this case on behalf of himself and all other similarly-situated

borrowers with loans serviced by Wells Fargo that have been placed into forbearance status without such borrowers' consent, excluding consumer debtors who have filed for bankruptcy protection under the provisions of Chapter 13 of the United States Bankruptcy Code (11 U.S.C. § 1301 et seq.), in order to redress and enjoin Defendants' practice of placing mortgage loans into CARES Act forbearances without borrowers' consent.

**Wells Fargo's Mortgage Servicing Business Model**

13.     Wells Fargo is a mortgage servicing company, which means that borrowers like the Plaintiff and the putative class members make their monthly mortgage payments to Wells Fargo, which is responsible for collecting and applying borrowers' payments on behalf of the owner of the borrowers' mortgage loans in accordance with the requirements of the borrowers' loan documents and applicable law, including relevant provisions of the Fair Credit Reporting Act, TILA, and RESPA, as implemented through Regulations X (RESPA) and Z (TILA).

14.     As part of its mortgage servicing operations, Wells Fargo collects borrowers' monthly payments, which are applied to principal and interest, taxes and insurance, and other fees and charges that may have been assessed to such accounts. Wells Fargo then disburses these payments to the appropriate parties, such as lenders, investors, taxing authorities, insurers, and other relevant entities.

15.     Wells Fargo earns revenue from mortgage loan servicing in several ways. Without limitation, examples of ways that Wells Fargo earns revenue for mortgage loan servicing include: (a) Wells Fargo earns a per-loan servicing fee established by its servicing agreements with the owner(s) or investor(s) that are entitled to payment of the principal and interest payments set forth in the mortgage loan instruments (i.e. Note and Deed of Trust / Mortgage); (b) Wells Fargo earns "float" income on unapplied funds, which accrues between when consumers pay and when funds

are remitted to the loans' owners; (c) Wells Fargo retains all or part of certain fees it collects from borrowers, such as late charges, and (d) for loans owned by Ginnie Mae, Fannie Mae, and Freddie Mac (GSE Loans), Wells Fargo earns incentive payments after loans are placed in forbearance and borrowers accept and comply with certain "workout options" offered by Wells Fargo to cure the forborne payments, which generally involve repayment plans, deferral agreements, or specific kinds of loan modifications.

**Mortgage "Forbearance"**

16. Importantly, "forbearance" of mortgage payments is not forgiveness of the borrower's obligation to make monthly payments that are "forborne." Rather, forbearance only puts off the borrower's duty to make mortgage payments during the applicable forbearance period.

17. At the conclusion of the forbearance period, any missed payments become immediately due and owing, unless the borrower makes alternative repayment arrangements with the servicer of the borrower's mortgage loans. In mortgage servicing parlance, these alternative repayment arrangements are known as "loan workout options."

18. For every Fannie Mae and Freddie Mac mortgage loan Wells Fargo places into forbearance, Wells Fargo stands to receive a minimum of $500 and up to $1,000 in incentive payments, depending which workout option Wells Fargo's borrower accepts at the conclusion of the forbearance term.

19. With respect to Ginnie Mae loans Wells Fargo places into forbearance, Wells Fargo also is entitled to receive incentive compensation for post-forbearance loan workouts, although the structure for calculating the amount of these incentive payments and the available workout options are different (in immaterial ways) for Ginnie Mae loans.

20.     Wells Fargo also stands to benefit from placing GSE loans in CARES Act forbearance as a strategy for limiting potential losses Wells Fargo would otherwise incur in the event borrowers default on forborne loans in the future.

21.     Servicers of Ginnie Mae loans (i.e. loans backed by the Fair Housing Administration ("FHA"), Veterans' Administration ("VA"), or U.S. Department of Agriculture ("USDA")) are required to advance borrowers' principal and interest payments to the investors holding certificates issued by the Ginnie Mae trust that owns the borrower's mortgage loan.

22.     For Ginnie Mae loans, like Mr. Forsburg's FHA loan, this obligation continues each month for the servicer whether or not the borrower actually makes a monthly principal and interest payment.

23.     However, servicers, like Wells Fargo, can avoid this obligation to advance principal and interest payments for borrowers' loans that have been delinquent for 90 or more days by repurchasing such loans from the Ginnie Mae trusts.  Ginnie Mae loans in CARES Act forbearance are treated as delinquent for purposes of this rule.

24.     In a July 13, 2020 article published by American Banker, an industry expert, commenting on Wells Fargo's purchase in June and July 2020 of $14 billion in Ginne Mae loans, explained, "When the loans become delinquent, it's cheaper for Wells to buy the loans than to advance principal and interest and pay a 4% coupon to investors when their cost of funds is lower." See  https://www.americanbanker.com/news/wells-fargo-buys-14b-of-delinquent-mortgages-tied-to-pandemic.

25.     In that same American Banker article, Wells Fargo spokesperson Tom Goyda confirmed that Wells Fargo's July 2020 repurchase of $14 billion in Ginnie Mae loans was related to COVID-related forbearances:

"In the normal course of business, Wells Fargo regularly purchases government-insured ... loans that are more than 90 days past due out of Ginnie Mae pools to manage balance sheet impacts and reduce expenses," said Goyda. "In June and July, the number of loans we purchased out of Ginnie Mae pools increased substantially due primarily to loans in COVID-related forbearances."

*Id.*

26.     According to Scott Buchta, the head of fixed-income strategy at Brean Capital, "Wells erred on the side of caution and put more people into forbearance programs in April than other servicers, on average[.]" *Id*.

27.     Wells Fargo's portfolio of Fannie Mae and Freddie Mac loans carries principal and interest payment advance obligations that are similar to to its advance obligations for Ginnie Mae loans, with one important difference specifically applicable to loans in CARES Act forbearance: Wells Fargo's principal and interest advance obligations on Fannie Mae and Freddie Mac loans that received a CARES Act forbearance terminate after Wells Fargo makes four advances of borrowers' missed principal and interest payments.

28.     So long as Fannie Mae and Freddie Mac loans are placed into a CARES Act forbearance, Wells Fargo is not required to repurchase delinquent Fannie Mae and Freddie Mac loans in order to be allowed to cease making principal and interest advances.  Instead, after Wells Fargo makes advances for four monthly principal and interest payments missed by the borrower on a loan in CARES Act forbearance it is not obligated to make further advances.

29.     Therefore, regardless of whether a loan is backed by Ginnie Mae, Fannie Mae, or Freddie Mac, Wells Fargo benefits from placing loans into CARES Act forbearances by limiting its exposure to principal and interest advance obligations in the event of future defaults.

30.     Meanwhile, in recent public statements by its top executives, Wells Fargo has made no secret of its assessment that the U.S. economy is likely headed for a serious downturn in the near future, as a consequence of the COVID-19 pandemic.

### Summary of Case

31.     Plaintiff seeks certification of a class of similarly situated consumer borrowers, as well as an order of this Court permanently enjoining, on a nationwide basis, Wells Fargo's practice of placing loans into forbearance status without borrowers' prior authorization.

32.     Plaintiff also asks the Court to allow the class to recover appropriate monetary relief, including actual damages, statutory damages, punitive damages and/or monetary sanctions, as well as an award of reasonable attorneys' fees and expenses from the Defendants for the Defendants' unjust enrichment and other tangible and intangible harms the members of this putative class have suffered as a result of Defendants' illegal scheme.  Plaintiff further seeks that these damages be trebled pursuant to the civil provisions of the RICO Act,.

33.     It is also important to clarify what this case is *not* about: Plaintiff in this case does not seek to prevent any borrower from properly entering into a forbearance agreement under and consistent with the requirements of the CARES Act (or otherwise) if the borrower has requested, understands, and wants it.

34.     With respect to the information Wells Fargo furnishes to the Credit Reporting Agencies, when Wells Fargo treats borrowers' loans as being in a forbearance status, Wells Fargo does not report its receipt and application of borrowers' payments received during the forbearance period, even when the borrower remains current on his or her payment obligations before, during, and after Wells Fargo places the loan in forbearance status.

35.     As a result, unless Wells Fargo ultimately approves and the borrower accepts a loan

retention workout option for curing the unauthorized forbearance, Wells Fargo's mortgage servicing system and associated servicing policies and procedures will likely result in third parties understanding Wells Fargo borrowers' loans as being in default. At a minimum, when a borrower's principal residence is reported as being in forbearance status, regardless of how the loan status is reported, lenders and other consumers of credit related information consider this a seriously delinquent status.

## PLAINTIFF'S BACKGROUND

### *Gerald Forsburg*

36.     Mr. Forsburg's mortgage loan, secured by a lien against his property located at 129 Shannon Ave. in Mount Jackson, Virginia (Shenandoah County), is a loan backed by FHA and serviced by Wells Fargo.

37.     Mr. Forsburg' personal liability on the mortgage loan secured by the Shannon Avenue property was discharged in a Chapter 7 bankruptcy in 2016, although the remaining unpaid debt on that loan continues to be secured by a lien against the Shannon Avenue property.

38.     After his Chapter 2016 bankruptcy, Mr. Forsburg's mortgage loan fell into default, and Mr. Forsburg began working with Wells Fargo in an effort to obtain a FHA Home Affordable Mortgage Program ("HAMP") loan modification in order to reduce his interest rate and monthly mortgage payment and to catch up on the arrears owing on the mortgage loan.

39.     In connection with his mortgage modification efforts, Mr. Forsburg accepted a trial modification plan offered by Wells Fargo, which required Mr. Forsburg to make three monthly payments of $848.53 for January, February, and March of 2020 as a precondition to Wells Fargo providing Mr. Forsburg with a final mortgage modification.

40.     Mr. Forsburg made each of the trial modification payments under the trial

modification plan on time and in full, as required.

41.    On March 11, 2020, Wells Fargo approved Mr. Forsburg's loan for a final FHA HAMP mortgage modification.

42.    The monthly payment under the terms of the Mr. Forsburg's modified mortgage loan is $831.75, with the first post-modification installment due May 1, 2020.

43.    Mr. Forsburg was not required to make a monthly payment for April of 2020 under the terms of his mortgage modification agreement. Moreover, Mr. Forsburg's modified monthly payment of $831.75 represents substantial savings compared with his pre-modification monthly mortgage payment of approximately $1,052.68. Moreover, the contract annual interest rate for Mr. Forsburg's modified loan is 3.5%, a significant reduction of the original interest rate of 4.875%.

44.    Mr. Forsburg's mortgage modification recapitalized $8,648.26 in unpaid amounts, resulting in a $148,633.85 new modified principal balance for his mortgage loan secured by the Shannon Avenue property.

45.    On March 18, 2020, Wells Fargo sent final modification paperwork via FedEx to Mr. Forsburg, with instructions that Mr. Forsburg needed to sign the documents and have them notarized before returning the executed documents to Wells Fargo.

46.    Mr. Forsburg received the FedEx from Wells Fargo with the final modification paperwork on March 19, 2020.

47.    On March 20, 2020, Mr. Forsburg executed the final modification documents before a notary, who notarized Mr. Forsburg's signature. Mr. Forsburg returned the final modification documents to Wells Fargo.

48.    On or about April 2, 2020, Mr. Forsburg attempted to log into Wells Fargo's online

payment portal in order to confirm that Wells Fargo had implemented his FHA HAMP mortgage modification and to make his May 1, 2020 modified monthly mortgage payment of $831.75.

49.     When he attempted to log in to make his mortgage payment on April 2, 2020, Mr. Forsburg received a message from Wells Fargo stating that his mortgage loan had not yet been updated with the terms of his March 11, 2020 Wells Fargo approved, fully executed, final FHA HAMP modification, and Wells Fargo indicated that it would "be in touch" with Mr. Forsburg "soon."

50.     Unbeknownst to Mr. Forsburg, sometime after March 20, 2020 and prior to April 2, 2020, Wells Fargo had placed his original, unmodified loan into a three month forbearance program, effective as of the mortgage payment due for April of 2020.

51.     Mr. Forsburg did not request that his mortgage loan be placed into forbearance prior to April of 2020, or at any time thereafter.

52.     Prior to placing Mr. Forsburg's loan into forbearance status for April of 2020, Wells Fargo did not inform Mr. Forsburg that placing his loan into forbearance would result in Wells Fargo terminating the final mortgage modification agreement Mr. Forsburg had accepted on March 20, 2020.

53.     Wells Fargo has not implemented the final FHA HAMP mortgage modification that it offered to Mr. Forsburg, which Mr. Forsburg has accepted.

54.     Instead, without notice to Mr. Forsburg, Wells Fargo unilaterally placed Mr. Forsburg's original, unmodified mortgage loan into forbearance status.

55.     As a result, without Mr. Forsburg's prior knowledge or consent, Wells Fargo cancelled the final FHA HAMP modification Mr. Forsburg had accepted on March 20, 2020.

56.     When Mr. Forsburg contacted Wells Fargo by telephone to make his May 2020

payment under the newly modified loan terms, he was told that he did not need to make a payment because his loan was in forbearance. Mr. Forsburg was not told at that time that his modification had not been implemented by Wells Fargo.

57.     As recently as July 21, 2020, a Wells Fargo representative told Mr. Forsburg that Wells Fargo placed all loans that were in the modification process into forbearance status.

58.     Moreover, upon information and belief, after cancelling the modification and placing the loan in forbearance, Wells Fargo has also placed Mr. Forsburg's loan in foreclosure status.

59.     Mr. Forsburg has contacted Wells Fargo mutiple times regarding this issue and, despite spending anywhere from 45 – 90 minutes on the phone, has not received a definitive answer from Wells Fargo regarding this issue.  Indeed, Wells Fargo's representatives have given him conflicting information about the status of his mortgage loan after Wells Fargo placed his account in forbearance.

60.     In an article by Pulitzer Prize winning journalist Gretchen Morgenson, writing for NBC News, a Wells Fargo representative explained that it was Wells Fargo's practice to unilaterally place loans of borrowers who were in the modification process into forbearance status under the CARES Act, without such borrowers' prior knowledge or consent.   Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time.  Wells Fargo had other plans for him.* NBCNews, July 16, 2020, https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

61.     Wells Fargo's website's "FAQ" section related to COVID-19 and CARES Act forbearance indicates that Wells Fargo cancels pending modification applications for its borrowers when *borrowers* accept a CARES Act forbearance.  Moreover, Plaintiff was told by a Wells Fargo

representative that Wells Fargo placed borrowers with pending loan modifications into forebearances.

62.     Mr. Forsburg had the ability and intention of making the payments required of him under his modified loan terms, as set forth in the final modification documents he executed and returned to Wells Fargo on March 20, 2020.

63.     Mr. Forsburg did not want or request a CARES Act forbearance from Wells Fargo.

64.     Mr. Forsburg has been prevented from making any payment via Wells Fargo's online payment system, other than payment in the amount of his pre-modification loan; Wells Fargo gives him no option to specify a different payment amount.

65.     Wells Fargo's actions in placing Mr. Forsburg's loan in forbearance, without Mr. Forsburg's knowledge or consent, deprived Mr. Forsburg of the opportunity to cure his arrears and lower his interest rate through the modification.

### *Jorge Goytisolo, III*

66.     Jorge Goytisolo, III's mortgage loan, secured by a lien against his homestead property located at 4306 Portola Ave., Los Angeles, CA 90032, is a federally-related mortgage loan backed by Fannie Mae and serviced by Wells Fargo.

67.     Mr. Goytisolo did not request a forbearance of his mortgage loan from Wells Fargo.

68.     Mr. Goytisolo and his wife did contact Wells Fargo by telephone to obtain information about the CARES Act forbearance program. However, after learning that the CARES Act forbearance program would merely delay their monthly mortgage payment obligations, Mr. Goytisolo and his wife decided against the forbearance and specifically informed Wells Fargo that they did not want their loan to be placed into forbearance.

69.     Despite Mr. Goytisolo's and his wife's specific and unambiguous statements to

Wells Fargo that she and Mr. Goytisolo did not want their loan to be put into forbearance, Wells Fargo placed their loan into forbearance status anyway.

70.     After putting Mr. Goytisolo's loan into forbearance status against his wishes, Wells Fargo furnished trade line information to the credit reporting agencies, indicating that Mr. Goytisolo's mortgage loan was in forbearance status.

71.     Mr. Goytisolo was current on his mortgage loan before he and his wife contacted Wells Fargo to inquire about the CARES Act forbearance program, and they have continued to make their ongoing monthly mortgage payments to Wells Fargo, on time and in full, ever since.

72.     However, in addition to reporting that Mr. Goytisolo's loan was in forbearance status, following Mr. Goytisolo's inquiry, from that point forward, Wells Fargo stopped reporting that it was receiving Mr. Goytisolo's monthly mortgage payments each month.

73.     Subsequent to their inquiry to Wells Fargo regarding information about CARES Act forbearances, Mr. Goytisolo and his wife have been attempting to refinance their mortgage loan in order to take advantage of the historically low interest rates that are currently available.

74.     Mr. Goytisolo and his wife discovered that Wells Faro was reporting to the credit reporting agencies that their loan was in forbearance when they applied to refinance their mortgage loan.

75.     Indeed, Mr. Goytisolo has been unable to complete a refinance of his mortgage loan serviced by Wells Fargo precisely *because* Wells Fargo has been reporting the loan as being in forbearance status.

76.     In the weeks since Mr. Goytisolo and his wife realized that their mortgage loan was placed in forbearance by Wells Fargo against their wishes, they have spent substantial time and resources in their efforts to have Wells Fargo correct their account and credit information.

77. Although Wells Fargo supposedly adjusted their account and credit reporting, Mr. Goytisolo and his wife have not received written confirmation from Wells Fargo regarding such supposed adjustments. They still have not had their refinance approved.

### Other Class Member Borrowers Similarly Affected

78. As reported by Gretchen Morgenson, borrowers in at least 14 different states have been placed in mortgage loan forbearances by Wells Fargo that they did not want or request. Gretchen Morgenson, *More Wells Fargo customers say the bank decided to pause their mortgage payments without asking*, NBCNews, July 22, 2020, https://www.nbcnews.com/business/personal-finance/more-wells-fargo-customers-say-bank-decided-pause-their-mortgage-n1234610.

79. NBCNews reposts that Tammi Wilson ("Ms. Wilson") has a mortgage loan account that is serviced by Wells Fargo.  In March 2020, Ms. Wilson checked the status of her mortgage loan account on Wells Fargo's website.  While there, Ms. Wilson clicked on a link and provided contact information to receive information regarding COVID-19 payment assistance.  *Id.*

80. When Ms. Wilson went to make her April 2020 mortgage payment online, she received a pop up message stating she had no active accounts and could not make a payment.  *Id.* Ms. Wilson later learned that Wells Fargo had placed her into a CARES Act forbearance without her knowledge.  *Id.*

81. Ms. Wilson did not ask for the forbearance and continued to make her monthly mortgage payments.  *Id.*

82. After spending hours on the phone with Wells Fargo representatives, Wells Fargo sent Ms. Wilson a letter dated July 1, 2020 confirming her request to opt out of the forbearance program.  *Id.*

83. Despite opting out of the program, Ms. Wilson's recent credit report indicates that her mortgage loan is in forbearance and that her April and May payments were not credited to her account, even though Ms. Wilson submitted the payments. *Id.*

84. Also according to NBCNews, Eileen Roth, a Wells Fargo customer in New York, also received a forbearance that she did not want. *Id.* Ms. Roth was notified by Wells Fargo on June 22, 2020 that Wells Fargo had suspended the auto-draft of Ms. Roth's mortgage payments on March 20 due to the forbearance. *Id.* Ms. Roth's credit report also indicates that her mortgage loan account is in forbearance. *Id.*

85. In response to questioning by Ms. Morgenson, Wells Fargo's representative stated: "As soon as COVID began to impact our customers, Wells Fargo was intently focused on assisting any customers who needed help, and we have deferred 2.5 million payments for consumer and small business customers as a result. During the early stages of the crisis — even before the CARES act was passed — we provided relief to mortgage and home equity customers who we learned were impacted by COVID over the phone, through our secure email channel, or through other means. Customers placed in forbearance received notices of that action through multiple channels, and we removed them from forbearance upon their request." *Id.*

86. According to the Consumer Finance Protection Bureau, a mortgage servicer is supposed to receive an attestation from a borrower of a COVID-19 related financial hardship prior to granting a forbearance. *Id.* However, upon information and belief, Wells Fargo does not require an attestation from borrowers, as neither Plaintiff nor the borrowers featured in Ms. Morgenson's report provided an attestation to Wells Fargo.

## IV.  CLASS ALLEGATIONS

87.     Wells Fargo has placed loans of borrowers it services into forbearance status without its borrowers' consent.

88.     Nothing in the CARES Act or any other law or agreement between Plaintiff (including the putative members of the class) and Wells Fargo authorizes Wells Fargo to unilaterally place borrowers' mortgage loan accounts into forbearance status without their consent.

89.     It is either Wells Fargo's explicit intent and policy to place borrowers' loans into forbearance without authorization or Wells Fargo has no policies and/or procedures in place to prevent it from placing loans into forbearance status without its borrowers' consent, or whatever policies and procedures Wells Fargo does maintain are either inadequate or are not enforced by Wells Fargo in a manner that is reasonably calculated to prevent Wells Fargo from placing loans into forbearance without borrowers' prior knowledge or consent.

90.     Wells Fargo is also compensated by the various federal agencies on whose behalf it services borrowers' loans when it completes loan retention workout options with borrowers whose loans have been placed into forbearance pursuant to the CARES Act.

91.     For each loan placed into forbearance for which Wells Fargo subsequently defers repayment of some or all of the forborne payments until loan maturity in accordance with Fannie Mae and Freddie Mac's matrix for loan retention workout options, Wells Fargo receives an incentive fee of $500.

92.     For each loan placed into forbearance for which Wells Fargo enters into a completed repayment plan in accordance with Fannie Mae and Freddie Mac's matrix for loan retention options Wells Fargo receives an incentive fee of $500.

93.     Wells Fargo also receives servicing income for the loans it services, and Plaintiff is informed and believes and therefore alleges that Wells Fargo is therefore incentivized to modify its customers' mortgage loans following a CARES Act forbearance in a way that extends the loan's term and lowers the borrower's monthly mortgage payment in order to prevent "run off" of loan servicing rights, which occurs when borrowers sell their homes or refinance their mortgages.  Thus, upon information and belief, Wells Fargo uses these false forbearance notices to increase its mortgage servicing income by lowering borrowers' monthly mortgage payments in order to keep them paying on their existing (albeit modified) mortgage loans.

94.     Wells Fargo has previously been admonished for engaging in similar conduct involving providing its borrowers with products and services that are detrimental to the borrowers, without such borrowers' prior knowledge or consent, including:

- Filing Rule 3002.1 Notices of Mortgage Payment Change that falsely asserted that borrowers had agreed to mortgage loan modifications that the borrowers knew nothing about, including in the United States Bankruptcy Court for the Western District of Pennsylvania and in the United States Bankruptcy Court for the Western District of North Carolina.[1]

---

[1] In *In re Eyer*, the bankruptcy court for the Western District of Pennsylvania entered an order striking a notice of mortgage payment change related to a modification that the debtor did not request because the notice had "nothing to do with the [d]ebtor's current obligations under its note and/or mortgage with Wells Fargo." *In re Eyer*, Case No. 12-70985, Memorandum Order Striking Notice of Payment Change, Docket No. 93 (Bankr. W.D. Penn. Dec. 30, 2015). Further, Chief Bankruptcy Judge Beyer, in the Western District of North Carolina, entered an order in *In re Allen* regarding Wells Fargo's practice of filing Rule 3002.1 Notices of Monthly Mortgage Payment Change that falsely stated that borrowers' loans were subject to modifications that such borrowers had not requested and knew nothing about, a practice that Judge Beyer described as, "beyond the pale of due process." *In re Allen*, Case No. 13-31034, Order Sustaining Objection to Notice of Mortgage Payment Change, Docket No. 29 (Bankr. W.D. N.C. Sept. 19, 2016).  Judge Beyer also entered an order sustaining a debtor's objection to a similar notice of mortgage payment change regarding a modification the debtor did not request, requiring Wells Fargo to pay the debtor's counsel's fees incurred for filing the objection.  *See In re Roman*, Case No. 15-31462, Order Sustaining Objection to Notice of Mortgage Payment Change, Awarding Fees and Expenses to Debtor's Counsel to be Paid by Wells Fargo, and Setting Compliance Hearing for October 25, 2016, Docket No. 34 (Bankr. W.D. N.C. Oct. 14, 2016).

- In the United States Bankrutpcy Court for the Western District of Virginia alone, Plaintiff's counsel have identified at least eleven false forbearance notices Defendants have prepared, executed, filed, and served in debtors' Chapter 13 bankruptcy cases.

- In an article by Ms. Morgenson, published by NBC News on July 22, 2020 and discussed *supra*, numerous other instances of this same misconduct – placing loans into forbearance without borrower authorization - is described with respect to several borrowers, including the named Plaintiff, Gerald Forsburg.

95.     In addition to the named Plaintiff, Plaintiff's counsel are aware of Wells Fargo engaging in similar conduct with respect to loans secured by properties of borrowers located in California, Georgia, Texas, New Jersey, Missouri, Tennessee, New Hampshire, Florida, and Connecticut.  Upon information and belief, Wells Fargo has been engaging in these same practices on a nationwide basis.

96.     Because Wells Fargo's wrongful conduct is widespread and uniform, this case should be certified for class action treatment pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) and (3).

97.     The class Plaintiff seeks to represent consists of all individuals in the United States:

- Whose loans were placed into forbearance by Wells Fargo without the borrowers' consent, but

- Excluding borrowers who have filed for bankruptcy protection under chapter 13 of the United States Bankruptcy Code.

98.     The class does not include the Judges of this Court, the Judges of the United States Courts of Appeals, or the Justices of the United States Supreme Court.

99.  <u>Numerosity</u> – The class is so numerous, with class members throughout the country, that joinder of all class members is impracticable.  A class action is the only feasible method of adjudicating the rights of the affected borrowers, and, absent allowance of a certification of a class action, a failure of justice will result.  An investigation of Defendants' forbearance practices across the United States has revealed that Defendants are placing borrowers' loans into forbearance status without their consent on a nationwide basis. The number of putative class members that have already been identified is sufficient to justify further discovery to establish the numerosity element of Rule 23, as there are likely many more unidentified putative class members throughout the country.

100.  <u>Commonality</u> – The questions of law and fact common to all class members that predominate over those pertaining to individual class members include, but are not limited to, whether Wells Fargo engaged and engages in the policies and practices complained of and whether such actions violate federal and other common law duties, as alleged herein.  Specifically, the common question of law is whether Defendants' practice of placing loans into forbearance without borrowers' prior consent violates the CARES Act, RICO, and/or RESPA, as well as whether such conduct constitutes Fraud, Breach of Contract, and Gross Negligence.  The common facts are that Defendants have placed borrowers' loans into forbearance without consent to do so, and Defendants have falsely reported to the nation's credit reporting agencies that such loans were placed into forbearance at borrowers' request and have failed to report to the nation's credit reporting agencies that borrowers' loan payments have been received and applied despite having received such payments.

101. <u>Typicality</u> - Plaintiff's claims are typical of the claims of the class members. All are based on the same factual and legal theories. The Plaintiff has been subjected to the same misconduct as the members of the proposed class.

102. <u>Adequacy of representation</u> – Plaintiff will fairly and adequately protect the interests of all class members. Plaintiff understands his responsibilities to the class as a whole, and understands that Defendants' practice of placing borrowers' loans into forbearance causes borrowers harm, aggravation, credit damage, risk of not being hired or of losing employment, risk of losing status or security clearance with employers, and can prevent borrowers from accessing the credit markets that would otherwise be available to them, including credit cards, refinance loans, unsecured lines of credit, home equity lines of credit, and other harmful consequences resulting directly from Wells Fargo's unauthorized placement of borrowers' loans into forbearance status. Plaintiff has retained capable counsel experienced in state and federal consumer law and consumer class-action litigation. Neither Plaintiff nor his counsel have any conflicts that would interfere with the vigorous prosecution of this action.

103. A class action is superior to other available methods for the fair and efficient adjudication of this controversy in that:

(a) the class necessarily consists of persons who may be unaware of Wells Fargo's unauthoized and undisclosed placement of loans into forbearance status, who may not be aware of or capable of funding the cost of litigating individual actions against Wells Fargo,

(b) many class members lack the sophistication to recognize that Wells Fargo's actions are unlawful and to retain litigation counsel,

(c) many class members have acceded or will accede to Defendants' unlawful conduct, and

(d) there is no reason that the courts should be burdened with multiple lawsuits challenging Defendants' facially improper practice of placing borrowers' loans into forbearance without borrowers' consent.

104.    Defendants, in placing borrowers' loans into forbearance without borrowers' consent, have acted and refused to act on grounds generally applicable to the class as a whole.

## V. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") ENTERPRISE ALLEGATIONS

105.    Plaintiff repeats and realleges the allegations in this complaint.

### *The Enterprise*

106.    Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

107.    Based upon Plaintiff's current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "Wells Fargo Enterprise:" (1) Wells Fargo, (2) vendors, including (without limitation) Black Knight, Inc. ("Black Knight"), and unknown mail vendors who either directly assist or provide systems that assist Wells Fargo, (3) the GSEs on whose behalf Wells Fargo services borrowers' loans, and (4)  the GSE sponsored Trusts that own borrower's loans (as to which Wells Fargo collects borrowers' payments and distributes them to the trusts), as well as the investors in the trusts themselves who reap a portion of the proceeds Wells Fargo obtains in connection with its misconduct.

108.    Upon information and belief, vendors involved in the Wells Fargo Enterprise provide Wells Fargo with services and/or assistance with, or otherwise participate in the enterprise by (a) identifying accounts of borrowers for placement into forbearance status; (b) preparing and mailing and/or emailing correspondence related to borrowers' accounts that have been placed into forbearance status without their consent; (c) communicating information to credit reporting agencies related to accounts that Wells Fargo has placed into forbearance status without borrowers'

prior consent, and/or reporting such information once communicated by Wells Fargo through or with the assistance of other participants in the Wells Fargo Enterprise, and (d) assisting Wells Fargo with loan workout options to address the mortgage arrearages resulting from Wells Fargo's unauthorized placement of borrowers' loans into forbearance status.

109.    The Wells Fargo Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

110.    The members of the Wells Fargo Enterprise function as a continuing unit and share the common purpose of maximizing their profits by subjecting Plaintiff and class members to the consequences of unauthorized mortgage loan forbearances.

111.    The Wells Fargo Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendant Wells Fargo, Wells Fargo's other corporate affiliates and subsidiaries, Black Knight, Experian, TransUnion, Equifax, Fannie Mae, Freddie Mac, Ginnie Mae, InfoEx, various law firms, print and mailing vendors, internet service providers, and other entities participating in conducting the affairs of the enterprise. Wells Fargo, Experian, Equifax, Transunion, Fannie Mae, Freddie Mac, Ginnie Mae, InfoEx, various law firms, and print and mailing vendors use Black Knight's MSP mortgage loan servicing system and associated communication network as a common mortgage loan servicing, communication, and accounting system of record to store and communicate data related to the accounts of borrowers whose loans Wells Fargo places into forbearance without borrowers' prior knowledge or consent.

112.    While Defendants participate in and are members and part of the Wells Fargo Enterprise, they also have an existence separate and distinct from the enterprise.

113.     Defendants control, operate, and direct the affairs of the Wells Fargo Enterprise by, among other things determining that borrowers' accounts should be placed into forbearance status, programming their computer systems to generate, store, and communicate information related to the identification of and subsequent treatment of loans placed into forbearance without borrowers' consent.

114.     The Wells Fargo Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

### *Predicate Acts*

115.     § 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Defendants have engaged, and continue to engage, in conduct violating each of these laws in order to effectuate their scheme.

### *Violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343*

116.     As alleged herein, for the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations, or promises, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to correspondence and electronic communication with borrowers, the GSEs, print and mail vendors, and the credit reporting agencies regarding loans placed into forbearance without borrowers' authorization, as well as correspondence regarding proposed loan workout options, credit

reporting, investor reporting, payment distributions, workout incentive compensation, loan buybacks and/or suspension of principal and interest advance obligations, among other things.

117.    For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, including but not limited to loan data, proposed loan modification terms, agreements, email correspondence, monthly mortgage statements, telephone correspondence, credit reporting information, investor reporting, and made or caused to be made false statements over the telephone, facsimile, electronic mail, and the internet.

118.    The matter and things sent by Defendants via the Postal Service, commercial carrier, wire, or other interstate electronic media included, inter alia: false reports to credit reporting agencies that borrowers requested forbearance and/or failure to report and/or disclose payment receipts; false, deceptive and misleading written correspondence with borrowers; email correspondence; data used to place accounts into forbearance status and/or to inform third parties of borrowers' loans that Wells Fargo placed into forbearance status without borrowers' consent; agreements; monthly mortgage statements; investor reporting; correspondence; and payments.

119.    Other matter and things sent through or received via the Postal Service, commercial carrier, wire, or other interstate electronic media by Defendants include information or communications in furtherance of or necessary to effectuate the scheme.

120.    Defendants' misrepresentations, acts of concealment, and failures to disclose were knowing and intentional and made for the purpose of deceiving borrowers, the GSEs, investors in GSE-backed trusts, the credit markets, equity and debt investors in Wells Fargo, and other persons, regulators, and entities to conceal or perpetuate Wells Fargo's unlawful scheme.

121.     Because this is a class action, and there were numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiff to plead all details of the scheme with particularity. Therefore, Plaintiff cannot plead the precise dates of all of Defendants' use of the U.S. mail and interstate wire facilities, and corresponding acts of mail and wire fraud, as this information cannot be alleged without access to Defendants' records.

122.     Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and the GSEs, their investors, Defendants' debt and equity investors, the credit reporting agencies, and participants in credit markets that rely on the integrity of credit information, as well as the Plaintiff and the other members of the class, relied upon or were injured by others' reliance upon the Defendants' misrepresentations and omissions.  Had the GSEs and their investors, Wells Fargo's debt and equity investors, the participants in the credit markets, and Plaintiff and other members of the class known the truth that Wells Fargo's placement of loans into forbearance status without borrower authorization was used as a profit center and/or unlawful loss mitigation hedge, rather than to effectuate bona fide, authorized, requested, agreed, and lawful agreements regarding the mortgage payment obligations of Plaintiff and other members of the class, they would have immediately rejected and disregarded Defendants' misconduct.

### *Pattern of Racketeering Activity*

123.     The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e. indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years.

124.     Defendants did not begin placement of borrowers' mortgage loans into unauthorized CARES Act forbearances until on or after March 27, 2020, when the CARES Act

was passed by Congress, which is within four years of Plaintiff's filing of their original complaint in this case.

125.    Each of the Defendants has committed numerous acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiff and the other class members.

126.    The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of rackeering activity" as defined in 18 U.S.C. § 1961(5).

## VI.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF RICO 18 U.S.C. § 1962(c)

127.    Plaintiff repeats and realleges the allegations in this complaint.

128.    This claim for relief arises under 18 U.S.C. § 1964(c).

129.    § 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

130.    Through the pattern of racketeering activities outlined above, the Defendants have conducted and participated in the affairs of the Wells Fargo Enterprise.

131.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Wells Fargo Enterprise through a pattern of racketeering activity comprised of

numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

133. As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the Wells Fargo Enterprise through a pattern of racketeering.

133. As a direct and proximate result, Plaintiff and class members have been injured in their business or property or both by the predicate acts, which make up the Defendants' patterns of racketeering activity.

134. Specifically, and as set forth elsewhere herein, Plaintiff and class members, the integrity of the housing market and consumer credit markets, as well as GSE-sponsored mortgage trusts, have been injured by Defendants in their business or property in a variety of ways, including by Wells Fargo actively undermining Plaintiff's and the other class members' ability to pay their mortgages without unlawful interference by Wells Fargo in the form of placing borrowers' loans into forbearance status without prior authorization.

135. Plaintiff and the other class members have also been injured in that their mortgage loans have been unlawfully subjected to the risk that they could be treated as being in contractual default as a result of Defendants' unauthorized forbearances and/or by the harm to borrowers' credit that results from having a mortgage loan that is improperly designated as being in forbearance status. Additional harms include threats to borrowers' ability to obtain, advance in, or maintain employment and/or loss of stature and other reputational damage to affected borrowers, denial of credit applications and/or obtaining higher cost credit than borrowers would ordinarily be entitled to obtain, freezing of accounts and loss of access to credit, cancellation of loan modifications in process and/or cancellation of completed and final loan modifications, and

other economic harms, as well as needless aggravation, frustration and outrage over Defendants' misconduct, which Plaintiff and other class members did nothing to provoke.

136.    Plaintiff was injured by Wells Fargo's material ommissions of fact and fraudulent placement of his loan into forbearance status, experiencing cancellation of his mortgage modification, credit damage, loss of access to credit markets and/or home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages.

## COUNT II
## (FRAUD)

137.    Plaintiff repeats and realleges the allegations in this complaint.

138.    Wells Fargo made material omissions of fact in failing to disclose to Plaintiff that it had placed his loans into forbearance without his consent.

139.    Plaintiff detrimentally relied upon Wells Fargo's material omissions of fact when they did not inform Plaintiff promptly that his account had been placed in forbearance and Plaintiff did not challenge the forbearance to preserve his modification.   Moreover, class members continued to make their monthly mortgage payments with the understanding and expectation that doing so would result in their loans being serviced in the ordinary course of business without the consequences associated with having a loan characterized as being in forbearance status.

140.    Plaintiff's reliance on Wells Fargo's material omissions of fact was justified and reasonable, as Plaintiff was performing under his mortgage loans and had no basis to assume and was not on notice that Wells Fargo would defraud him by placing his loans into forbearance status without authorization, and no common law, statute, or other agreement among Plaintiff and his mortgage lender and/or Wells Fargo authorized Wells Fargo to place borrowers' loans into forbearance without his consent.

141.    Plaintiff was injured by Wells Fargo's material ommissions of fact and fraudulent placement of his loan into forbearance status, experiencing cancellation of his mortgage modification, credit damage, loss of access to credit markets and/or home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages.

### COUNT III
### (VIOLATIONS OF THE TRUTH IN LENDING ACT & REAL ESTATE SETTLEMENT PROCEDURES ACT)

142.    Plaintiff repeats and realleges the allegations in this complaint.

143.    As discussed above, mortgage servicers are responsible for collecting and processing mortgage payments received from borrowers.  Any delay in processing payments can result in unwarranted late fees and/or unjustified claims of borrower default.

144.    Complaints about slow payment processing led the Federal Reserve Board in 2008 to promulgate a rule requiring mortgage servicers to credit payments to consumers' accounts as of the date of receipt.  Reg. Z, 12 CFR § 1026.36(c)(1)(i); 73 Fed. Reg. 44,522 (July 30, 2008). Section 1464 of the Dodd-Frank Act, enacted in 2010, essentially codified the FRB rule, and the CFPB finalized regulations implementing the prompt crediting provision of the Dodd-Frank Act.  See 78 Fed. Reg. 10,902 (effective Jan. 10, 2014).

145.    The Dodd-Frank Act amendments to the Truth in Lending Act ("TILA") also mandate that servicers credit periodic payments on consumer credit transactions secured by a consumer's principal dwelling as of the date of receipt. Like the FRB rule, there is an exception when a delay in crediting the payment does not result in any charge to the consumer or in the reporting of negative credit information to a consumer reporting agency. These statutory

requirements were implemented through regulations that became effective on January 10, 2014.  15 USC 1639f(a).

146.    The Official Interpretations to Regulation Z provide guidance on the exception permitting a delay in posting if there are no negative consequences to the consumer:

> Under § 1026.36(c)(1)(i), a mortgage servicer must credit a payment to a consumer's loan account as of the date of receipt. This does not require that a mortgage servicer post the payment to the consumer's loan account on a particular date; the servicer is only required to credit the payment *as of* the date of receipt. Accordingly, a servicer that receives a payment on or before its due date (or within any grace period), and does not enter the payment on its books or in its system until after the payment's due date (or expiration of any grace period), does not violate this rule as long as the entry does not result in the imposition of a late charge, additional interest, or similar penalty to the consumer, or in reporting of negative information to a consumer reporting agency.

Official Interpretations to Reg. Z, ¶ 36(c)(1)(i)-1 (emphasis in original).

147.    There is no exception to the prompt crediting rules when the borrower is in bankruptcy or in a trial loan modification. There is also no specific exception to the rule for small servicers.  See 78 Fed. Reg. 10,902, 10,956 (Feb. 14, 2013).

148.    The requirements of TILA typically do not directly apply to loan servicers. However, because 12 C.F.R. § 1024.36(b)(3) of the Real Estate Settlement Procedures Act ("RESPA") specifically identifies a violation of TILA under 12 C.F.R. § 1026.36(c)(1) as an error relating to the servicing of a borrower's mortgage loan, failure to comply with TILA's requirement that payments be credited as of the date of receipt is a RESPA violation.

149.    Upon information and belief, Wells Fargo has placed Plaintiff's mortgage loan account into forbearance without Plaintiff's knowledge, consent, or approval and violated RESPA and TILA by failing to apply Plaintiff's monthly mortgage payments as of the date they came due and failing to report publicly that payments made by Plaintiff have actually been received and applied.

150. Upon information and belief, Wells Fargo has demonstrated a pattern and practice of failing to comply with Regulations X and Z because Wells Fargo has engaged in this practice of placing borrowers in unwanted and unauthorized forbearance agreements on a nationwide basis.

151. As a result, Plaintiff has been injured as a result of Wells Fargo's failure to comply with the requirements of RESPA and TILA. Plaintiff has experienced cancellation of his mortgage modification, credit damage, loss of access to credit markets and/or home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages.

152. Accordingly, Wells Fargo is liable to Plaintiff for actual damages, costs, attorneys' fees, and statutory damages of at least $2,000.00 per violation, pursuant to 12 U.S.C. § 2605.

## COUNT IV
## (BREACH OF CONTRACT)

153. Plaintiff repeats and realleges the allegations in this complaint.

154. The note and deed of trust and/or mortgage for the Plaintiff's mortgage loan constitutes a valid contract between Plaintiff and the owner of his loan.

155. Plaintiff tendered performance according to the terms of the contract.

156. Defendant breached the Plaintiff's mortgage loan contract by placing him into forbearance status without Plaintiff's consent.

157. Defendants also breached the Plantiff's and other class members' mortgage loan contracts by placing borrowers' mortgage payments into suspense accounts instead of applying funds received according to the payment application provisions of such borrowers' mortgage notes and deeds of trusts/ mortgage

158. Plaintiff has incurred actual damages and attorneys' fees as a result of Defendants' breaches of their mortgage loan contracts.

159.    Plaintiff is entitled to recover his actual damages and attorneys' fees for Defendants' breaches of their mortgage loan contracts, and request that the Court award the same.

### COUNT V
### (GROSS NEGLIGENCE)

160.    Plaintiff repeats and realleges the allegations in this complaint.

161.    In a mortgagor-mortgagee relationship, a lender owes a borrower the duty to exercise reasonable care to avoid a foreseeable risk of injury to the borrower. *Hurd v. BAC Loan Servicing, LP*, 880 F. Supp.2d 747, 763 (N.D. Tex. 2012) (citing *Thrash v. Ocwen Loan Servicing, LLC*, 433 B.R. 585, 598-97 (Bankr. N.D. Tex. 2010). *See also Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2008, no pet.)(citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987)(Every person has a duty to exercise reasonable care to avoid foreseeable risk of injury to others.)); *Trevino v. HSBC Mortgage Services, Inc. (In re Trevino)*, 535 B.R. 110, 150-151 (Bankr. S.D. Tex. 2015).

162.    By knowingly placing borrowers' loans into forbearance status without their consent, Defendants demonstrated an utter disregard of prudence amounting to complete neglect of the safety and financial welfare of the Plaintiff and the other class representatives. Wells Fargo's misconduct is such a degree of negligence as would shock any fair minded person. *Ferguson v. Ferguson*, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971) (emphasis omitted).

163.    Alternatively, or additionally, Wells Fargo's placement of Plaintiff's and other class members mortgage loans into forbearance status without their knowledge or consent, after enumerating on its own website and other published materials, and in spite of its own institutional knowledge regarding how the credit markets function and the effect on consumers' credit caused by notations that loans are in forbearance status, Wells Fargo acted with willful and wanton negligence, acting consciously in disregard of Plaintiffs and the other class members' rights or

acting with reckless indifference to the consequences, of which Wells Fargo was aware, from its knowledge of existing circumstances and conditions, that its conduct probably would cause injury to Plaintiffs and the other class members. *Woods v. Mendez*, 265 Va. 68, 76-77 (2003).

164.     As a result of Wells Fargo's conduct as described herein, Plaintiff has experienced cancellation of his mortgage modification, credit damage, loss of access to credit markets and/or home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages

**COUNT VI**
**(ATTORNEYS' FEES)**

165.     Plaintiff repeats and realleges the allegations in this complaint.

166.     Through the conduct described herein and as set forth above, Wells Fargo has inflicted actual damages upon Plaintiff in a variety of ways.

167.     Moreover, Plaintiff has been forced to retain legal counsel, who has incurred reasonable and necessary attorneys' fees on their behalf.  Such fees are properly taxed against Wells Fargo by virtue of Wells Fargo's violations of RICO, RESPA, and for its liability to Plaintiff resulting from its fraud and/or gross negligence and breaches of contract. The Court may, and on these facts the Court should, award Plaintiff his attorneys' fees as against Wells Fargo pursuant to the Court's inherent authority.

**VII.   REQUEST FOR DECLARATORY RELIEF**

168.     Plaintiff repeats and realleges the allegations in this complaint.

169.     As outlined in the preceding counts and the preceding factual allegations, Wells Fargo has violated the CARES Act, TILA, RESPA, and RICO.

170.     Particularly with respect to the CARES Act, which does not provide an independent private right of action for borrowers whose loans are impacted by servicer misconduct in violation

of the CARES Act's express requirements, a Declaratory Judgment confirming the unlawful nature of Wells Fargo's placement of borrowers' loans into CARES Act forbearance without their consent is necessary to protect other borrowers against similar, future violations by Wells Fargo and to put other mortgage servicers on notice that the kind of conduct outlined herein is unlawful.

## VIII.  REQUEST FOR PRELIMINARY INJUNCTION

171.    Plaintiff repeats and realleges the allegations in this complaint.

172.    Pursuant to Fed. R. Civ. P. 65, Plaintiff and the class are entitled to a preliminary injunction enjoining Wells Fargo from engaging in the acts and practices described herein, including:

- Placing borrowers' loans into forbearance status without authorization from the borrowers.

- Canceling any loan modifications in progress or completed prior to placing loans into forbearance status without borrower authorization.

- Communicating to any credit reporting agency, GSE, or other third party that a borrower's loan is in forbearance status unless the borrower authorized placement of the loan into forbearance.

- Forclosing on any borrower whose loan was placed into forbearance status without authorization so long as this case is pending.

- Sending false and misleading communications to class members regarding the status of their mortgage loans.

173.    Plaintiff asserts that Wells Fargo will continue to wrongfully treat loans as being in forbearance and/or will place loans into forbearance status without the consent of the borrowers

on such loans, in direct violation of the requirements of the CARES Act and in breach of borrowers' mortgage loan agreements.

174.    There is a substantial likelihood that Plaintiff will prevail on the merits, as numerous courts and regulators have already sanctioned Wells Fargo for similar misconduct. *See* **Appendix 1**.

175.    The harm faced by the Plaintiff and the class outweigh any "harm" that will be sustained by Wells Fargo if the preliminary injunction were granted.  The summary of some of the panoply of the harms to borrowers (and to the integrity of the financial system) caused by Wells Fargo's misconduct is described above.  These harms far outweigh Wells Fargo's interest in profiting and/or minimizing losses by illegally placing borrowers' loans into forbearance status.

176.    Issuing a preliminary injunction will not adversely affect the public interest but rather will enhance it.  Wells Fargo's actions flout the clear requirements of the CARES Act, and make a mockery of the integrity of the credit markets, GSEs' mortgage backed investment trusts, and other fundamental aspects of financial systems, as well as the good faith market participants who rely upon its transparency to make informed decisions. Wells Fargo's actions broadcast (again) its perception that it has impunity for conduct that overtly disobeys the provisions of the laws of the United States. Wells Fargo's actions erode public confidence in the rule of law and the integrity of our free markets, which depend on participants, especially major national banks like Wells Fargo, playing by the rules and not making up rules as they go along according to what seems convenient.

177.    The public has the right to expect that the courts will not condone contemptuous disregard for the laws of the United States and will act to appropriately sanction bad faith actors who cause harm to the economy and especially to individual consumers who have done nothing

wrong. Even though the Court should balance the threatened injury to Plaintiff against any harm to the defendant, when balancing the hardships of the public interest against a private interest, the public interest should receive greater weight. *See FTC v. World Wide Factors*, 882 F.2d 344, 346-47 (9th Cir. 1989). The substantial adverse effects of Wells Fargo's unauthorized mortgage forbearances militates strongly in favor of this Court issuing a preliminary injunction.

178.    The posting of a bond is not a prerequisite to the issuance of a preliminary injunction in this case because Wells Fargo cannot demonstrate that preserving the status quo will cause it cognizable economic harm. *See FTC v. Southwest Sunsites, Inc.*, 665 F. 2d 711, 714 n.1 (5th Cir. 1982) (ruling that a temporary restraining order or preliminary injunction may be granted without bond). Wells Fargo's unauthorized placement of borrowers' loans into forbearance alters the status quo. The Plaintiff and class members were in the status quo when they were paying their mortgages in the ordinary course. The status quo is the mortgage loan contract, and since the Plaintiff and class members have demonstrated no desire to modify the status quo, the posting of security is unnecessary.

179.    In addition, or alternatively, the Court can issue a preliminary injunction to prevent Wells Fargo from taking the actions Plaintiff and the class seek to enjoin based on its inherent authority. Plaintiff and class members have alleged that Wells Fargo is engaging in brazen violations of clearly articulated and duly ratified law of the United States, as embodied in the CARES Act, and the preliminary injunction is simply a directive of the Court seeking to ensure that such violation(s) cease and that the status quo contemplated by the CARES Act be restored.

180.    Plaintiff asks the Court to set this application for preliminary injunction for hearing if the parties are unable to agree to a preliminary injunction and, after hearing the request, issue a preliminary injunction against Wells Fargo enjoining it from the actions set out above.

## IX.  REQUEST FOR PERMANENT INJUNCTION

181.    Plaintiff repeats and realleges the allegations in this complaint.

182.    Plaintiff and the class are entitled to an injunction permanently enjoining Wells Fargo from engaging in the acts and practices above as to any person who is a member, or could become a member, of the class of persons described in this suit.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff respectfully prays that Defendants be cited to appear and answer these allegations and that, upon final trial of this cause, they be granted all relief to which they are justly entitled, including:

a.    Certification of the class of borrowers that were placed in mortgage forbearances by Defendants without the borrowers' authorization or consent;

b.    All actual damages, including attorneys' fees and costs (at trial and on appeal) to which Plaintiff is entitled;

c.    All compensatory damages to which Plaintiff is entitled, including attorneys' fees and costs, exemplary damages, and/or punitive damages, treble damages, and sanctions for Defendants' actions as described herein, and a finding of contempt;

d.    An injunction preventing Defendants from engaging in the conduct described herein and requiring Defendants to obtain authorization from borrowers before placing borrowers in a mortgage forbearance; and

e.    All such other and further relief as this Court may deem just and proper.

Respectfully submitted,

*/s/ Malissa L. Giles*                    Theodore O. Bartholow III ("Thad")*
Malissa L. Giles                          Texas State Bar No. 24062602
Tracy Giles                               Karen L. Kellett*
Giles & Lambert, PC                       Texas State Bar No. 11199520
PO Box 2780                               O. Max Gardner III*
Roanoke, VA 24001                         N.C. State Bar No. 6164
Tel: (540) 981-9000                       KELLETT & BARTHOLOW PLLC
mgiles@gileslambert.com                   11300 N. Central Expressway, Suite 301
                                          Dallas, TX 75243

Abelardo Limon, Jr.*
Texas State Bar No. 1235770
Limon Law Office P.C.
890 W. Price Road
Brownsville, TX 78520
Tel: (956) 544-7770
Fax: (956) 544-4949
alimon@limonlaw.com

Tel.: (214) 696-9000
Fax: (214) 696-9001
thad@kblawtx.com
kkellett@kblawtx.com
maxgardner@maxgardner.com

*Attorneys for the Plaintiff*

*Pro Hac Vice Applications Forthcoming