IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
HARRISONBURG DIVISION

| | | |
|---|---|---|
| GERALD FORSBURG, JENNA DOCTOR, LUIS CASTRO, MARISOL CASTRO, and BARBARA PRADO on behalf of themselves and all others similarly situated, | § § § § § | |
| | § | CAUSE NO. 5:20-CV-00046 |
| Plaintiffs, | § § | |
| v. | § § | JURY DEMAND |
| WELLS FARGO & CO., | § § | |
| and | § § | |
| WELLS FARGO BANK, N.A., | § § | |
| Defendants. | § | |

**PLAINTIFFS' THIRD AMENDED CLASS ACTION COMPLAINT
AND APPLICATION FOR INJUNCTIVE RELIEF**

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiffs Gerald Forsburg, Jenna Doctor, Luis Castro, Marisol Castro, and Barbara Prado, on behalf of themselves and all others similarly situated, file this third amended class action complaint against Defendants Wells Fargo & Co. ("WFC") and Wells Fargo Bank, N.A. ("WFBNA")(collectively, Wells Fargo & Co. and Wells Fargo Bank, N.A. are referred to herein as "Wells Fargo"), seeking relief for Plaintiffs and all other similarly situated consumer borrowers in the Western District of Virginia and elsewhere nationwide, who have been subjected to Defendants' unlawful practice of placing its customers' mortgage loans into unwanted and harmful "forbearance" status.

## I. PARTIES

**Plaintiffs:**

1.      Plaintiff Gerald Forsburg ("Mr. Forsburg") owns a home located in Mount Jackson, Virginia.  Mr. Forsburg's property is encumbered by a lien securing repayment of a federally related and federally guaranteed loan backed by the Fair Housing Administration ("FHA"), which loan is serviced by Wells Fargo.

2.      Plaintiff Jenna Doctor ("Ms. Doctor") is a citizen of Florida whose homestead property is located in Castleberry, Florida.  Ms. Doctor's homestead property is encumbered by a lien securing repayment of a federally related loan backed by the FHA, which loan is serviced by Wells Fargo.

3.      Plaintiffs Luis and Marisol Castro ("Mr. and Mrs. Castro") are Texas citizens whose homestead property is located in Dallas, Texas.  Mr. and Mrs. Castro's property is encumbered by a lien securing repayment of a federally related loan backed by the Federal National Mortgage Association ("Fannie Mae").

4.      Plaintiff Barbara Prado ("Ms. Prado") is a California citizen whose homestead property is located in Freemont, California.  Freemont California is within the geographical boundary of the Northern District of California. Ms. Prado's property is encumbered by liens securing repayment of two federally related loans backed by the FHA, which are both serviced by Wells Fargo.

**Defendants:**

5.      Defendant Wells Fargo & Co. is a diversified financial services company headquartered in San Francisco, California that provides banking, insurance, investments,

mortgage banking, and consumer finance through banking stores, the internet, and other distribution channels to customers, businesses, and other institutions in all 50 states and in other countries.

6.      According to a December 2019 Wells Fargo company presentation, as of September 2019, Wells Fargo was the largest mortgage servicer in the country, servicing 8.2 million loans totaling $1.4 trillion dollars in unpaid balances.

7.      Wells Fargo & Co. is the parent corporation of Defendant Wells Fargo Bank, N.A. Wells Fargo & Co. exercises specific and financial control over the operations of Defendant Wells Fargo Bank, N.A., dictates the policies, procedures, and practices of Wells Fargo Bank N.A., exercises power and control over the specific activities upon which the claims herein are based, and is the ultimate recipient of the ill-gotten gains described herein. Wells Fargo & Co. represents on its website that it controls and sets the standard for its loan servicing business, stating that:

> Wells Fargo & Company Responsible Servicing Principles for U.S. Residential Real Estate Lending . . . Wells Fargo's vision to satisfy all our customers' financial needs . . . Similarly, we have long adhered to [] responsible servicing practices. . . .

8.      Defendant Wells Fargo & Co. ("WFC") may be served with process through its registered agent, CSC – Lawyers Incorporating Service, at 2710 Gateway Oaks Dr., Suite 150N, Sacramento, CA 95833.

9.      Defendant Wells Fargo Bank, N.A. is a subsidiary of Wells Fargo & Co. Wells Fargo Bank, N.A. is a national association that is headquartered in South Dakota and may be served with process through its registered agent, Corporation Service Company, at 10 Shockoe Slip, Fl 2, Richmond, VA 23219.  Wells Fargo Bank, N.A. can also be served through Charles Scharf, CEO, at 101 North Phillips Avenue Sioux Falls, SD 57104.

10.     Wells Fargo Bank, N.A. conducts mortgage servicing operations through its Wells Fargo Home Mortgage division, which is headquartered in Des Moines, Iowa.  Plaintiffs' mortgage loans are currently serviced by Wells Fargo Bank, N.A.

## II. JURISDICTION AND VENUE

11.     The Court has jurisdiction over the lawsuit because the suit arises under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud), the Truth in Lending Act ("TILA"), as implemented through Regulation Z, and the Real Estate Settlement Procedures Act ("RESPA"), as implemented through Regulation X.

12.     The Court also has jurisdiction over the lawsuit under 28 U.S.C. § 1332(d), the Class Action Fairness Act, because the suit is a class action, the parties are minimally diverse, and the amount in controversy exceeds $5 million, excluding interest and costs.

13.     The Court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).  The Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' common law claims against Wells Fargo because Plaintiffs' non-statutory claims are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article 3 of the U.S. Constitution.  The Court also has jurisdiction over Plaintiffs' state law claims in this action pursuant to 28 U.S.C. § 1367.

14.     This Court has jurisdiction over Defendants because Defendants purposefully availed themselves of the privilege of conducting activities in the Commonwealth of Virginia and established minimum contacts sufficient to confer jurisdiction over Defendants.  The assumption of jurisdiction over Defendants will not offend traditional notions of fair play and substantial justice

and is consistent with the constitutional requirements of due process. Defendants had continuous and systemic contacts with the Commonwealth of Virginia sufficient to establish general jurisdiction over Defendants.

15.     The causes of action pled in this third amended complaint arose from or related to contacts of Defendants to the Commonwealth of Virginia, which gives this Court specific jurisdiction to decide Plaintiffs' claims against Defendants.

### General Personal Jurisdiction in the Northern District of California

16.     The principal place of business of Defendant Wells Fargo & Co. ("WFC") is located in San Francisco, California.

17.     WFC has admitted in this litigation and in related cases of *Delpapa*, *Green*, *Healy*, and *Urista* that its principal place of business is located in San Francisco, California.

18.     The principal place of business of Defendant Wells Fargo Bank, N.A. ("WFBNA") is located in San Francisco, California.

19.     The place where WFBNA maintains its headquarters is San Francisco, California, which is the actual center of direction, control, and coordination of the operations of WFBNA. In other words, WFBNA's "nerve center" is located in San Francisco, California.

20.     WFBNA has sufficiently continuous and systematic contacts in the Northern District of California to subject WFBNA to general personal jurisdiction in the Northern District of California.

21.     WFBNA has minimum contacts in the Northern District of California such that the maintenance of this suit would not offend traditional notions of fair play and substantial justice.

**PLAINTIFFS' THIRD AMENDED CLASS ACTION**
**COMPLAINT AND APPLICATION FOR INJUNCTIVE RELIEF**

22. WFBNA's current and historical affiliations with the State of California are so substantive, deep, constant, and pervasive as to render WFBNA essentially "at home" in California.

23. No other state in the U.S. has affiliations with WFBNA that are remotely comparable to WFBNA's current or historical affiliations with the State of California. This was true at the time of the conduct alleged in this complaint, and it continues to be true at present.

24. At all times pertinent to the allegations in this Complaint, Wells Fargo has had more customer accounts in California than in any other state.

25. At all times pertinent to the allegations in this Complaint, the balance of all commercial and residential mortgage loans secured by California property that are owned or serviced by WFBNA has been greater than the balance of commercial and residential mortgage loans in any other state that WFBNA owns or services.

26. WFBNA's portfolio of California loans is so extensive that WFC's 2019 and 2020 annual reports separately identify WFC's exposure to WFBNA's California loan portfolio as a material independent risk factor. WFC's 2019 and 2020 annual reports contain no equivalent disclosure with respect to its lending activities in any other state.

27. Wells Fargo has marketed itself as a 'California Bank' throughout Wells Fargo's 150+ year history, and Wells Fargo has continued to reaffirm in media reports as recently as this year that San Francisco is still and will continue to be its banking headquarters.

28. The ubiquitous "stagecoach" logo Wells Fargo has employed for decades is an image invoking the covered wagons Wells Fargo's banking operations used in the 1800s to ferry borrowers' deposits across the Great Plains, to and from California.

29. Nowhere else in the world could "Wells Fargo" collectively or WFBNA in particular be considered to be more "at home" and amenable to suit than in San Francisco, California.

30. WFC's annual reports include descriptions of major litigation and regulatory action pending against WFBNA, and the major litigation described in WFC's annual reports for each year from 2019 through 2021 disclose more major cases pending in courts in the State of California than in any other state. In particular, WFC's 2019-2021 annual reports identify more major cases against WFBNA pending in the United States District Court Northern District of California than in any other single judicial forum nationwide. Accordingly, as a practical matter, it would not be inconvenient or otherwise offend traditional notions of fair play and substantial justice for the District Court for the Northern District of California to exercise general personal jurisdiction over Wells Fargo in this case.

31. Upon information and belief, the principal place of business of the entity commonly known to the public as "Wells Fargo," which is the trade name for the combined operations of WFC and WFBNA and other affiliated entities that are also owned by WFC and controlled by its management, is now and has for more than 150 years always been located in the Northern District of California.

32. Based on the foregoing, WFBNA's contacts with the State of California, and in particular the Northern District of California, are so substantial and are of such a pervasive nature as to justify suit against WFBNA on causes of action arising from dealings entirely distinct from the operations that form its ordinary business operations.

33. Although WFBNA, as a national banking association, is not required to officially designate a "principal place of business," WFBNA's principal place of business is one and the same as that of WFC, which is San Francisco, California.

34. In a multi-billion-dollar settlement with the United States Department of Justice in 2018, a copy of which is attached hereto as **Exhibit 1**, WFBNA and WFC each separately acknowledged that its principal place of business was located in San Francisco, California.

35. WFBNA's principal place of business has not changed in the period of time between when it entered into the 2018 settlement with the Department of Justice and the time of WFBNA's conduct (starting in 2020) that is the subject of this complaint.

36. In several cases, courts have stated that WFBNA's principal place of business is in San Francisco or California, including *Rouse v. Wachovia Mortg. FSB*, 747 F.3d 707 at 709 (9th Cir. 2014)(Wells Fargo's "principal place of business is in California"); *Grace v. Wells Fargo Bank, N.A.*, 926 F. Supp. 2d 1173, 1175 n.1 (S.D. Cal. 2013) (noting that "Wells Fargo does not contest that its principal place of business is in San Francisco . . ."); *Singer v. Wells Fargo Bank, N.A.*, 2012 WL 2847790, at *1 (C.D. Cal. 2012) ("[i]n other cases, Wells Fargo has conceded that its principal place of business is in California"); *Mount v. Wells Fargo Bank, N.A.*, 2008 WL 5046286, at *1 (C.D. Cal. 2008) ("Wells Fargo Bank, N.A. . . . has regularly described its principal place of business as San Francisco . . ."). Other courts in the Ninth Circuit have made similar observations. *See, e.g., Flores v. Wells Fargo Bank, N.A.*, 2012 WL 832546, at *1 (N.D. Cal. 2012) ("Wells Fargo's principal place of business . . . is California"); *Uriarte v. Wells Fargo Bank, N.A.*, 2011 WL 5295285, at *1 n. 2 (S.D. Cal. 2011) ("Wells Fargo does not contest that its principal place of business is in San Francisco . . .").

37. Earlier this year, Judge Huff, of the Southern District of California, recently found in two related cases (*Healy* and *Urista*) that WFBNA's principal place of business is in San Francisco, in the Northern District of California. *Healy, et al. v. Wells Fargo Bank, N.A., et al.*, 2022 WL 104733, at *4 (S.D. Cal. Jan. 11, 2022); *Urista v. Wells Fargo & Co., et al.*, 2022 WL 194278 (S.D. Cal. Jan. 11, 2022).

38. According to its website's contact information pages for its business and consumer banking customers, "Wells Fargo's" mailing address for its corporate offices is 420 Montgomery Street in San Francisco, California. Wells Fargo's website also includes other addresses for various financial services departments of Wells Fargo, none of which are located in South Dakota. *See,* https://www.wellsfargo.com/biz/help/addresses; https://www.wellsfargo.com/help/addresses

39. WFC makes the following representations in its 2019 annual report:

We will operate as one company, not a series of decentralized businesses.

WFC 2019 Annual Report, p. 17.

When we refer to "Wells Fargo," "the Company," "*we*," "our" or "us," we mean Wells Fargo & Company and Subsidiaries (consolidated). Wells Fargo & Company (the Parent) is a financial holding company and a bank holding company.

WFC 2019 Annual Report, p. 129 (emphasis added).[1]

Wells Fargo & Company is a diversified, community-based financial services company with $1.9 trillion in assets. Founded in 1852 and *headquartered in San Francisco, we* provide banking, investment and mortgage products and services, as well as consumer and commercial finance, through 7,400 locations, more than 13,000 ATMs, digital (online, mobile and social), and contact centers (phone, email and correspondence), *and we* have offices in 32 countries and territories to support customers who conduct business in the global economy.

WFC 2019 Annual Report, p. 30 (emphasis added).

---

[1] WFBNA is defined as a subsidiary of WFC in WFC's 2019 annual report.

40.     WFC makes the following representation in its 2020 annual report:

> While our businesses are strong individually, they are even more powerful when working together. Though we talk about separate lines of business, we operate as one company in our communities.

WFC 2020 Annual Report at p. 9.

41.     In WFC's 2020 annual report filed with the Securities and Exchange Commission, WFC describes in detail WFC's elimination of all internal distinctions between WFC's affiliates and lines of business, including distinctions between the operation and management of lines of business within WFBNA and those of other affiliates and subsidiaries within the overall corporate structure. Thus, upon information and belief, although WFBNA, as a national banking association, is a separate legal entity subject to separate laws and regulations and having specific rights and obligations associated with banks under the National Banking Act not otherwise available to a bank holding company such as WFC, structurally and in practice, WFBNA was and is still wholly controlled and operated by the decisionmakers at WFC.

42.     Although WFBNA's current certificate of authority to transact business on file with the State Corporation Commission of the Commonwealth of Virginia indicates that WFBNA's "principal office address" is located in South Dakota, that document also reveals that more than half of WFBNA's named directors are located in California, with the remainder of its directors spread across various other states. A copy of entity information report for WFBNA filed with the SCC for the Commonwealth of Virginia is attached hereto as **Exhibit 2**.

43.     WFBNA's out-of-state financial institution registration on file with the Secretary of State for the State of Texas designates WFBNA's official address as 420 Montgomery Street, San Francisco, CA 94163.

44.     According to WFC's annual reports for 2019 and 2020, since 1931, WFC's and WFBNA's auditors have been auditors with the San Francisco office of KPMG.

45.     Wells Fargo's online instructions for wire transfers to WFBNA provide an address for WFBNA in San Francisco, California. See https://www08.wellsfargomedia.com/assets/pdf/personal/help/wire-transfer-quick-reference.pdf

46.     WFBNA's principal place of business is *not* located in South Dakota.

47.     WFBNA's formal designation of South Dakota as the location of its "main office," for purposes of registration of WFBNA under the National Bank Act, 12 U.S.C. §§ 21 *et seq.*, has not altered the fact that WFBNA's principal place of business is and always has been located in San Francisco, California.

48.     According to the Secretary of State for the State of South Dakota, WFBNA's registration of the business name "Wells Fargo Bank, NA" was cancelled in 2019, and the South Dakota Secretary of State's business name registry does not reflect any other active business with the same or a similar name. A copy of the "Business Name Registration Detail" report from the South Dakota Secretary of State is attached hereto as **Exhibit 3.**

### *Specific Personal Jurisdiction*

49.     WFBNA is also subject to specific personal jurisdiction in the United States District Court for the Northern District of California based on its alleged conduct with respect to named Plaintiff Barbara Prado, who resides in the Northern District of California and whose property that secures repayment of the mortgage loans serviced by WFBNA that are the subject of this complaint is located in the Northern District of California.

50.     As alleged herein, WFBNA's conduct with respect to Ms. Prado was part of WFBNA's continuous and systematic in-state business activities in California, including but not limited to its servicing of Ms. Prado's mortgage loans, its alleged unauthorized imposition of forbearance status on those loans, its unilateral termination of Ms. Prado's automatic payment arrangements for Ms. Prado's mortgage loans, its false, deceptive, and misleading communications with Ms. Prado at one of WFBNA's California branch banking locations in the Northern District of California, its telephone communications and written communications with Ms. Prado regarding and sent to her home, all of which occurred in or were directed toward and/or sent to persons or property located in the Northern District of California.

51.     WFBNA's conduct as alleged herein with respect to its communications with Ms. Prado and WFBNA's handling of Ms. Prado's accounts for mortgage loans secured by property located in the Northern District of California create a substantial connection with the State of California that is not random, fortuitous, or attenuated. WFBNA's conduct within the State of California is the conduct that gives rise to Ms. Prado's claims against WFBNA. As such, WFBNA is subject to specific jurisdiction in the Northern District of California.

52.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because the property securing Plaintiff Forsburg's loan at issue in this case, which is Forsburg's real property, is located in this district.

53.     Similarly, should the case be transferred to the Northern District of California, venue would also be proper there because the property securing Ms. Prado's mortgage loan at issue in this case, which is Ms. Prado's real property and home, is located within the Northern District of California.

## III. <u>FACTS</u>

54.     Plaintiffs file this case on behalf of themselves and all other similarly situated borrowers with loans serviced by Wells Fargo that have been placed into forbearance status without such borrowers' consent, excluding consumer debtors who have filed for bankruptcy protection under the provisions of Chapter 13 of the United States Bankruptcy Code (11 U.S.C. § 1301 et seq.), in order to redress and enjoin Defendants' practice of placing mortgage loans into CARES Act forbearances without borrowers' consent.

55.     Plaintiffs seek certification of a nationwide class and state-wide subclasses of similarly situated consumer borrowers, as well as an order of this Court permanently enjoining, on a nationwide basis, Wells Fargo's practice of placing loans into forbearance status without borrowers' prior authorization.

56.     Plaintiffs also ask the Court to allow the nationwide class to recover appropriate monetary relief, including actual damages, statutory damages, punitive damages and/or monetary sanctions, as well as an award of reasonable attorneys' fees and expenses from the Defendants for the Defendants' unjust enrichment and other tangible and intangible harms the members of this putative class have suffered as a result of Defendants' illegal scheme.  Plaintiffs further seek that these damages be trebled pursuant to the civil provisions of the RICO Act.

57.     It is also important to clarify what this case is *not* about: Plaintiffs in this case do not seek to prevent any borrower from properly entering into a forbearance agreement under and consistent with the requirements of the CARES Act (or otherwise) if the borrower has requested, understands, and wants loan forbearance.

58.     With respect to the information Wells Fargo furnishes to the Credit Reporting

Agencies, when Wells Fargo treats borrowers' loans as being in a forbearance status, Wells Fargo suppresses reporting of information regarding its receipt and application of borrowers' payments received during the forbearance period, even when the borrower remains current on his or her payment obligations before, during, and after Wells Fargo places the loan in forbearance status. Moreover, Wells Fargo reports that the loan is in forbearance, which appears in the comments section of the tradeline for the mortgage loan on the borrower's credit reports.

59.    The absence of the monthly payment information and the forbearance notation on the borrower's credit reports gives lenders the impression that the borrower is in financial distress and often results in the borrower being unable to obtain credit or refinance existing loans.

60.    As a result, at the conclusion of the unauthorized forbearance period, unless Wells Fargo ultimately approves and the borrower accepts a loan retention workout option for curing the unauthorized forbearance, Wells Fargo's mortgage servicing system and associated servicing policies and procedures will result in borrowers' loans being delinquent and being reported to credit reporting agencies as delinquent.

61.    While a borrower's mortgage loan is reported by the credit reporting agencies as being in active forbearance status, whether or not the borrower has remained current on his/her payments during the forbearance period, lenders and other consumers of credit related information consider the fact that the loan is in forbearance to be a seriously negative indication regarding the borrower's creditworthiness.

### *Wells Fargo's Mortgage Servicing Business Model*

62.    Wells Fargo is a mortgage servicing company, which means that borrowers like the Plaintiffs and the putative class members make their monthly mortgage payments to Wells Fargo,

which is responsible for collecting and applying borrowers' payments on behalf of the owner of the borrowers' mortgage loans in accordance with the requirements of the borrowers' loan documents and applicable law, including relevant provisions of the Fair Credit Reporting Act, TILA, and RESPA, as implemented through Regulations X (RESPA) and Z (TILA).

63. As part of its mortgage servicing operations, Wells Fargo collects borrowers' monthly payments, which are applied to principal and interest, taxes and insurance, and other fees and charges that may have been assessed to such accounts. Wells Fargo then disburses these payments to the appropriate parties, such as lenders, investors, taxing authorities, insurers, and other relevant entities.

64. Wells Fargo earns revenue from mortgage loan servicing in several ways. Without limitation, examples of ways that Wells Fargo earns revenue for mortgage loan servicing include: (a) Wells Fargo earns a per-loan servicing fee established by its servicing agreements with the owner(s) or investor(s) that are entitled to payment of the principal and interest payments set forth in the mortgage loan instruments (i.e. Note and Deed of Trust / Mortgage); (b) Wells Fargo earns "float" income on unapplied funds, which accrues between when consumers pay and when funds are remitted to the loans' owners; (c) Wells Fargo retains all or part of certain fees it collects from borrowers, such as late charges, and (d) for loans owned by Ginnie Mae (i.e. loans backed by the Fair Housing Administration ("FHA"), Veterans' Administration ("VA"), or U.S. Department of Agriculture ("USDA")), Fannie Mae, and Freddie Mac (Ginnie Mae, Fannie Mae, and Freddie Mac loans are referred to herein collectively as "GSE loans"), Wells Fargo earns incentive payments after loans are placed in forbearance and borrowers accept and comply with certain

"workout options" offered by Wells Fargo to cure the forborne payments, which generally involve repayment plans, deferral agreements, or specific kinds of loan modifications.

*Wells Fargo Benefits from Placing Borrowers' Loans into Forbearance*

65.     Importantly, "forbearance" of mortgage payments is not forgiveness of the borrower's obligation to make monthly payments that are "forborne." Rather, forbearance only puts off the borrower's duty to make mortgage payments during the applicable forbearance period.

66.     At the conclusion of the forbearance period, any missed payments become immediately due and owing, unless the borrower makes alternative repayment arrangements with the servicer of the borrower's mortgage loan. In mortgage servicing parlance, these alternative repayment arrangements are known as "loan workout options."

67.     For every Fannie Mae and Freddie Mac mortgage loan Wells Fargo places into forbearance, Wells Fargo stands to receive a minimum of $500 and up to $1,000 in incentive payments, depending which workout option Wells Fargo's borrower accepts at the conclusion of the forbearance term.

68.     With respect to Ginnie Mae loans Wells Fargo places into forbearance, Wells Fargo also is entitled to receive incentive compensation for post-forbearance loan workouts, although the structure for calculating the amount of these incentive payments and the available workout options are different (in immaterial ways) for Ginnie Mae loans, depending on whether the loan was originated by the VA, the USDA, or the FHA.

69.     Wells Fargo also benefits from placing GSE loans in CARES Act forbearance as a strategy for limiting potential losses Wells Fargo would otherwise incur in the event borrowers default on forborne loans in the future.

70. Servicers of Ginnie Mae loans, including Wells Fargo, are required to advance borrowers' principal and interest payments to the investors holding certificates issued by the Ginnie Mae trust that owns the borrower's mortgage loan.

71. For Mr. Forsburg's, Ms. Doctor's, and Ms. Prado's FHA (Ginnie Mae) loans, this obligation to advance the borrower's principal and interest payment to the investor continues each month for the servicer (Wells Fargo) whether or not the borrower actually makes a monthly principal and interest payment.

72. However, Wells Fargo can avoid this obligation to advance principal and interest payments for borrowers with Ginnie Mae loans that have been delinquent for 90 or more days by repurchasing such loans from the Ginnie Mae trusts. Pursuant to applicable servicing guidelines, Wells Fargo may repurchase Ginnie Mae loans after they have been in CARES Act forbearance status for 90 or more days, including, upon information and belief, loans Wells Fargo has placed into forbearance status without the borrowers' consent and even when such borrowers were making ongoing monthly mortgage payments during the forbearance period.

73. In a July 13, 2020 article published by American Banker, an industry expert, commenting on Wells Fargo's purchase in June and July 2020 of $14 billion in Ginnie Mae loans, explained, "When the loans become delinquent, it's cheaper for Wells to buy the loans than to advance principal and interest and pay a 4% coupon to investors when their cost of funds is lower." See https://www.americanbanker.com/news/wells-fargo-buys-14b-of-delinquent-mortgages-tied-to-pandemic.

74.     In that same American Banker article, Wells Fargo spokesperson Tom Goyda confirmed that Wells Fargo's July 2020 repurchase of $14 billion in Ginnie Mae loans was related to COVID-related forbearances:

> "In the normal course of business, Wells Fargo regularly purchases government-insured ... loans that are more than 90 days past due out of Ginnie Mae pools to manage balance sheet impacts and reduce expenses," said Goyda. "In June and July, the number of loans we purchased out of Ginnie Mae pools increased substantially due primarily to loans in COVID-related forbearances."

*Id.*

75.     According to Scott Buchta, the head of fixed-income strategy at Brean Capital, "Wells erred on the side of caution and put more people into forbearance programs in April than other servicers, on average[.]" *Id.*

76.     Wells Fargo's portfolio of Fannie Mae and Freddie Mac loans carries principal and interest payment advance obligations that are similar to its advance obligations for Ginnie Mae loans, with one important difference specifically applicable to loans in CARES Act forbearance: Wells Fargo's principal and interest advance obligations on Fannie Mae and Freddie Mac loans that received a CARES Act forbearance terminate after Wells Fargo makes four advances of borrowers' missed principal and interest payments.

77.     So long as Fannie Mae and Freddie Mac loans are placed into a CARES Act forbearance, Wells Fargo is not required to repurchase delinquent Fannie Mae and Freddie Mac loans in order to be allowed to cease making principal and interest advances.  Instead, after Wells Fargo makes advances for four monthly principal and interest payments missed by the borrower on a loan that Wells Fargo has placed in a CARES Act forbearance, under applicable Fannie Mae

and Freddie Mac servicing guidelines, Wells Fargo no longer has any further obligation to advance principal and interest payments on the loan.

78.     Therefore, regardless of whether a loan is backed by Ginnie Mae, Fannie Mae, or Freddie Mac, Wells Fargo benefits from placing loans into CARES Act forbearances by limiting its exposure to principal and interest advance obligations in the event of future defaults.

79.     Meanwhile, in recent public statements by its top executives, Wells Fargo has made no secret of its assessment that the U.S. economy is likely headed for a serious downturn in the near future as a consequence of the COVID-19 pandemic.

### *Wells Fargo's False Forbearances Harm Borrowers*

80.     When Wells Fargo reports to the credit reporting agencies regarding loans in forbearance status, it adds a special comment code that indicates that the borrower's account is in a forbearance status and it suppresses information about payment activity on the loan during the period in which that special comment code is in place.

81.     For borrowers who are subjected to Wells Fargo's practice of placing accounts into forbearance status without the borrower's consent, potential credit grantors, insurers, current and/or potential employers, background checkers, and any other party who reviews such borrowers' credit reports are given the false impression that the borrower has experienced a serious economic hardship that is ongoing, when in reality this is not necessarily the case. However, because of Wells Fargo's improper suppression of payment information in its credit reporting for the unauthorized forbearance period, credit grantors and others are unable to see whether the borrowers have been making their mortgage payments during the unauthorized forbearance period.

82. When Wells Fargo places a borrower's account into forbearance status, Wells Fargo also automatically terminates in-progress modifications of borrowers' mortgage loans, even as to those borrowers, like Mr. Forsburg, whose modifications were previously approved by Wells Fargo, leaving uncured the accumulated arrearage payments that would otherwise have been cured by the modification.

83. Borrowers with loans placed into forbearance status without their consent also lose access to credit markets, including losing the ability to refinance existing loans or obtain credit cards or other kinds of new secured and unsecured lines of credit at the current historically low interest rates because Wells Fargo adds a special comment code to the credit reports of borrowers, indicating their mortgage loan has been placed into forbearance status and suppresses its reporting to the Credit Reporting Agencies of borrowers' monthly payments received and applied during the forbearance period, even when the borrower continues making monthly mortgage payments during the forbearance period.

84. Because the CARES Act only authorizes one opportunity for borrowers to obtain forbearance relief for up to 180 days, which relief may be extended at the borrower's request for an additional period of up to 180 days, Wells Fargo's placement of borrower accounts into forbearance status without their consent deprives borrowers of the ability to access the full relief available to them under the CARES Act when, if, and as needed, without notice to the borrowers.

85. Importantly, the CARES Act only authorizes borrowers to enter into forbearance once for each loan. This forbearance can be for an initial period of up to 180 days, which may be extended for up to an additional 180 days at the borrower's request.

86.     Thus, for example, consider what would happen to a borrower that made each monthly payment from April through September of 2020 after the borrower's loan was placed by Wells Fargo into unauthorized CARES Act forbearance status in April 2020: the September payment would be the final payment subject to the unauthorized initial 180 day forbearance period under the CARES Act, and, should the borrower require forbearance relief beginning in October, the borrower's only option would be to seek a 180 day "extension" of the unauthorized forbearance period, instead of being able to initiate a CARES Act forbearance for up to 180 days starting in October of 2020, which forbearance could then be extended under the CARES Act for an additional 180 days starting in April of 2021.

87.     Wells Fargo's false credit reporting regarding borrowers whose loans Wells Fargo places into forbearance status without authorization also causes borrowers to suffer needless reputational harm that can result in loss of employment opportunities, lost security clearances, increased insurance premiums, and other consequences resulting from Wells Fargo's false representations to the credit reporting agencies that such borrowers have voluntarily requested forbearance and/or Wells Fargo's failure to report such borrowers' ongoing monthly mortgage payments during the term of the forbearance.

88.     Wells Fargo's own website reveals that Wells Fargo is already conscious of many undesirable consequences of forbearances for borrowers. These include escrow shortages generated by forbearances (because the escrow portion of forborne payments is not subject to deferral) resulting in monthly escrow payment increases to collect the accumulated escrow shortages.

89.     Mortgage modifications-in-progress for borrowers whose loans are placed into forbearance status are also automatically cancelled by Wells Fargo.

90.     Borrowers in forbearance are also generally unable to refinance their mortgage loans and they experience other forms of credit impairment, including inability to access existing lines of credit and home equity loans, and inability to get new unsecured loans and credit cards. https://update.wf.com/coronavirus/home-lending/.

91.     Additionally, when Wells Fargo places a borrower's account into forbearance status, without notice to the borrower, Wells Fargo cancels the borrower's pre-arranged automatic payments and cuts off the borrower's access to Wells Fargo's online mortgage payment applications, requiring borrowers to pay by telephone or by mail to Wells Fargo. This practice often results in borrowers incurring late fees (which are income for Wells Fargo) and can cause unanticipated arrearages to accumulate.

92.     When Wells Fargo places borrowers' loans into unauthorized forbearance with respect to payments already made by the borrowers for months that have already come due, Wells Fargo deprives borrowers of some of the relief that would otherwise be available to them under the CARES Act in the event they later decide to request forbearance, denying such borrowers the opportunity to choose when to initiate a forbearance period and/or reducing the available forbearance period to which the borrower would otherwise be entitled under the CARES Act by counting months when the borrower actually paid their mortgage toward the total number of months of forbearance authorized by the CARES Act .

93.     Even as to those borrowers who Wells Fargo acknowledges have been placed into forbearance without their consent, Wells Fargo refuses to correct any such borrower's credit

reporting to reflect that the borrower's loan was never in forbearance status and continues to suppress accurate payment history information reflecting such borrower's monthly mortgage payments received and applied during the unauthorized forbearance period.

94.     Wells Fargo also refuses, in many instances, to terminate the unauthorized forbearance status it places on its borrowers' loans, and, in some instances, Wells Fargo even attempts to extend forbearances after its customers have told it that the forbearance is unwanted and unauthorized or that they no longer wish to have their loan treated as being in forbearance status.

## PLAINTIFFS' BACKGROUND

### Gerald Forsburg

95.     Mr. Forsburg's mortgage loan, secured by a lien against his property located at 129 Shannon Avenue in Mount Jackson, Shenandoah County, Virginia, is a loan backed by the FHA and serviced by Wells Fargo.

96.     Mr. Forsburg' personal liability on the mortgage loan secured by the Shannon Avenue property was discharged in a Chapter 7 bankruptcy in 2016, although the remaining unpaid debt on that loan continues to be secured by a lien against the Shannon Avenue property.

97.     After his 2016 bankruptcy, Mr. Forsburg's mortgage loan fell into default, and Mr. Forsburg began working with Wells Fargo in an effort to obtain a FHA Home Affordable Mortgage Program ("HAMP") loan modification in order to reduce his interest rate and monthly mortgage payment and to catch up on the arrears owing on the mortgage loan.

98.     In connection with his mortgage modification efforts, Mr. Forsburg accepted a trial modification plan offered by Wells Fargo, which required Mr. Forsburg to make three monthly

payments of $848.53 for January, February, and March of 2020 as a precondition to Wells Fargo providing Mr. Forsburg with a final mortgage modification.

99.     Mr. Forsburg made each of the trial modification payments under the trial modification plan on time and in full, as required.

100.     On March 11, 2020, Wells Fargo approved Mr. Forsburg's loan for a final FHA HAMP mortgage modification.

101.     The monthly payment under the terms of Mr. Forsburg's modified mortgage loan is $831.75, with the first post-modification installment due May 1, 2020.

102.     Mr. Forsburg was not required to make a monthly payment for April of 2020 under the terms of his mortgage modification agreement. Moreover, Mr. Forsburg's modified monthly payment of $831.75 represents substantial savings compared with his pre-modification monthly mortgage payment of approximately $1,052.68.  Additionally, the contractual annual interest rate for Mr. Forsburg's modified loan is 3.5%, a significant reduction of the pre-modification interest rate of 4.875%.

103.     Mr. Forsburg's mortgage modification recapitalized $8,648.26 in unpaid amounts, resulting in a $148,633.85 new modified principal balance for his mortgage loan secured by the Shannon Avenue property.

104.     On March 18, 2020, Wells Fargo sent final modification paperwork via FedEx to Mr. Forsburg, with instructions that Mr. Forsburg needed to sign the documents and have them notarized before returning the executed documents to Wells Fargo.

105.     Mr. Forsburg received the FedEx from Wells Fargo with the final modification paperwork on March 19, 2020.

106.    On March 20, 2020, Mr. Forsburg executed the final modification documents before a notary, who notarized Mr. Forsburg's signature and returned the final modification documents to Wells Fargo.

107.    On or about April 2, 2020, Mr. Forsburg attempted to log into Wells Fargo's online payment portal in order to confirm that Wells Fargo had implemented his FHA HAMP mortgage modification and to make his May 1, 2020 modified monthly mortgage payment of $831.75.

108.    When he attempted to log in to make his mortgage payment on April 2, 2020, Mr. Forsburg received a message from Wells Fargo stating that his mortgage loan had not yet been updated with the terms of his March 11, 2020, Wells Fargo approved, fully executed, final FHA HAMP modification, and Wells Fargo indicated that it would "be in touch" with Mr. Forsburg "soon."

109.    Unbeknownst to Mr. Forsburg, sometime after March 20, 2020 and prior to April 2, 2020, Wells Fargo had placed his original, unmodified loan into a three-month forbearance program, effective as of the mortgage payment due for April of 2020.

110.    Mr. Forsburg did not request that his mortgage loan be placed into forbearance prior to April of 2020, or at any time thereafter.

111.    Prior to placing Mr. Forsburg's loan into forbearance status for April of 2020, Wells Fargo did not inform Mr. Forsburg that placing his loan into forbearance would result in Wells Fargo terminating the final mortgage modification agreement Mr. Forsburg had accepted on March 20, 2020.

112.    Because Mr. Forsburg's loan was in forbearance status, Wells Fargo stopped implementation of the final FHA HAMP mortgage modification that it offered to Mr. Forsburg,

which Mr. Forsburg had accepted.

113. Instead, without notice to Mr. Forsburg, Wells Fargo unilaterally placed Mr. Forsburg's original, unmodified mortgage loan into forbearance status.

114. As a result, without Mr. Forsburg's prior knowledge or consent, Wells Fargo cancelled the final FHA HAMP modification Mr. Forsburg had accepted on March 20, 2020.

115. When Mr. Forsburg contacted Wells Fargo by telephone to make his May 2020 payment under the newly modified loan terms, he was told that he did not need to make a payment because his loan was in forbearance. Mr. Forsburg was not told at that time that his modification had not been implemented by Wells Fargo.

116. As recently as July 21, 2020, a Wells Fargo representative told Mr. Forsburg that Wells Fargo placed all loans that were in the modification process into forbearance status.

117. Moreover, upon information and belief, after cancelling the modification and placing the loan in forbearance, Wells Fargo has also placed Mr. Forsburg's loan in foreclosure status.

118. Mr. Forsburg has contacted Wells Fargo multiple times regarding this issue and, despite spending anywhere from 45 – 90 minutes on the phone, has not received a definitive answer from Wells Fargo regarding this issue. Indeed, Wells Fargo's representatives have given him conflicting information about the status of his mortgage loan after Wells Fargo placed his account in forbearance.

119. In an article by Pulitzer Prize winning journalist Gretchen Morgenson, writing for NBC News, a Wells Fargo representative explained that it was Wells Fargo's practice to unilaterally place loans of borrowers who were in the modification process into forbearance status

under the CARES Act, without such borrowers' prior knowledge or consent. Gretchen Morgenson, *Troy Harlow has always made sure to pay his mortgage on time. Wells Fargo had other plans for him.* NBCNews, July 16, 2020, https://www.nbcnews.com/business/personal-finance/troy-harlow-has-always-made-sure-pay-his-mortgage-time-n1233635.

120. Wells Fargo's website's "FAQ" section related to COVID-19 and CARES Act forbearance indicates that Wells Fargo cancels pending modification applications for its borrowers when *borrowers* accept a CARES Act forbearance. Yet, Mr. Forsburg was told by a Wells Fargo representative that *Wells Fargo* placed borrowers with pending loan modifications into forbearances.

121. Mr. Forsburg had the ability and intention of making the payments required of him under his modified loan terms, as set forth in the final modification documents he executed and returned to Wells Fargo on March 20, 2020.

122. Mr. Forsburg did not want or request a CARES Act forbearance from Wells Fargo.

123. During the unauthorized forbearance period, Mr. Forsburg was prevented from making any payment via Wells Fargo's online payment system, other than payment in the amount of his pre-modification loan; Wells Fargo gives him no option to specify a different payment amount.

124. Wells Fargo's actions in placing Mr. Forsburg's loan in forbearance, without Mr. Forsburg's knowledge or consent, deprived Mr. Forsburg of the opportunity to cure his arrears and lower his interest rate through the modification.

### *Jenna Doctor*

125. Ms. Doctor's mortgage loan, secured by a lien against her property located at 7

Hitching Post Ln, Casselberry, FL 32707, is a loan backed by the FHA and serviced by Wells Fargo.

126. Ms. Doctor and her husband are both employed and have been able to continue making their monthly mortgage payments without interruption. Mr. and Mrs. Doctor were current on their mortgage loan.

127. Around the second week of April 2020, Ms. Doctor, using her Wells Fargo online account, reviewed information about Wells Fargo's COVID-19 and CARES Act relief. After reviewing the information, Ms. Doctor elected not to enroll in the forbearance program because Ms. Doctor and her husband were able to continue making their payments and they had no financial need to forgo payments.

128. At no time did Ms. Doctor consent to or request that Wells Fargo place her mortgage loan account in forbearance.

129. However, at some point prior to June 29, 2020, Wells Fargo placed Ms. Doctor's mortgage loan account in forbearance status without Ms. Doctor's knowledge or consent.

130. Ms. Doctor is currently pregnant, with her baby due in late 2020. In June 2020, Ms. Doctor learned that her baby had developed a medical condition that would require treatment, causing Ms. Doctor and her husband to incur additional out-of-pocket medical expenses. Ms. Doctor and her husband also wish to make certain upgrades and improvements to their home prior to the birth of their child.

131. On or about June 29, 2020, Ms. Doctor contacted a loan officer at the Fairwinds Credit Union (the "Credit Union"), where Ms. Doctor is a member and account holder. Ms. Doctor sought to obtain a secured loan to cover both the out-of-pocket medical expenses for herself and her unborn child and the improvements to her homestead.

132. The Credit Union made a "hard inquiry" with Equifax on June 29, 2020. The credit information the Credit Union received in response to its inquiry indicated that Ms. Doctor's mortgage loan was in forbearance.

133. Also on June 29, 2020, the Credit Union informed Ms. Doctor that it could not extend Ms. Doctor credit because her mortgage loan was in forbearance. Ms. Doctor then informed the Credit Union that she was not in forbearance, that she had made her monthly mortgage payments each month, and that she never requested a forbearance with Wells Fargo.

134. Prior to June 29, 2020, Ms. Doctor had applied for and received several loans with the Credit Union. Ms. Doctor was informed by the Credit Union that the reason for the decision not to extend credit to Ms. Doctor on June 29, 2020 was because of the reporting or furnishing to the credit reporting agency that her Wells Fargo account was in forbearance for May and June 2020.

135. On June 29, 2020, Ms. Doctor called and spoke with a representative at Wells Fargo to dispute Wells Fargo's placement of her mortgage loan account into forbearance. Ms. Doctor confirmed with the Wells Fargo representative that her account was contractually current and that Wells Fargo had received and applied the monthly payments due for each month of the purported forbearance period.

136. During the phone call with Wells Fargo on June 29, 2020, Ms. Doctor was informed that she was automatically put in forbearance, since every Wells Fargo borrower has been affected by COVID-19. The Wells Fargo representative indicated that Ms. Doctor's account was in a forbearance from May 1, 2020 through July 1, 2020., but Ms. Doctor could "opt-out" of the forbearance program. Ms. Doctor demanded that her account be removed from the forbearance

program, as she had never requested any forbearance relief with Wells Fargo.

137.    On July 1, 2020, Ms. Doctor contacted Wells Fargo and spoke with a representative concerning its reporting of the unwanted forbearance to the credit agencies.  Wells Fargo refused to change the information it reported regarding Ms. Doctor's account and stated that the account would reflect she had chosen to opt out of the final forbearance month of July 2020.

138.    On July 6, 2020, Ms. Doctor contacted the Credit Union loan officer about the steps she took with Wells Fargo and what she needed to do to move forward with a loan.  Ms. Doctor was informed by the Credit Union that her Wells Fargo account was still reported as in forbearance.

139.    On July 6, 2020, Ms. Doctor called Wells Fargo and spoke with a Wells Fargo supervisor.  Ms. Doctor explained that she needed the forbearance removed from Wells Fargo's reporting to the credit reporting agencies because continued reporting would result in her being denied a loan with her Credit Union.  The Wells Fargo supervisor stated Wells Fargo could only send Ms. Doctor an official "opt out" document.

140.    Also on July 6, 2020, Wells Fargo sent an email to Ms. Doctor attaching a letter dated July 1, 2020, which referenced "Confirming your request to opt out of mortgage payment suspension" and stated that Wells Fargo was returning the account to normal servicing and "reporting payment activity to the consumer reporting agencies."

141.    For the months of April through July 2020, Wells Fargo furnished information to the credit reporting agencies that the status of Ms. Doctor's monthly mortgage payments was paid, paid as agreed, or current.  In addition, Wells Fargo furnished information that Ms. Doctor's mortgage loan account was in forbearance for at least May and June of 2020.

142.    On July 7, 2020, Ms. Doctor filed a complaint online with the Consumer Financial

Protection Bureau about Wells Fargo's credit reporting and reporting incorrect information. Specifically, Ms. Doctor complained that Wells Fargo placed her mortgage loan account in forbearance without her knowledge or consent and reported her mortgage loan as in forbearance to the credit reporting agencies, which would prevent Ms. Doctor from obtaining credit from her Credit Union until the reference to the forbearance was removed from her credit reports.

143.    On or about July 7, 2020, Ms. Doctor disputed with Equifax the reporting of false and incorrect information furnished by Wells Fargo stating that Ms. Doctor's mortgage loan account was in forbearance.

144.    On or about July 16, 2020, Ms. Doctor complained again about Wells Fargo's credit reporting and, by July 16, 2020, Equifax began a re-investigation of Ms. Doctor's dispute relating to Wells Fargo's reporting of her account as in forbearance.

145.    On July 31, 2020, Ms. Doctor sent written disputes to Equifax, Transunion, and Experian.

146.    On or about July 31, 2020, Ms. Doctor received a response from Wells Fargo concerning her complaint with the CFPB regarding Wells Fargo's placement and reporting of her account in a forbearance status. Wells Fargo states that it is "unable to remove the forbearance comment that was previously reported for April 1, 2020, through June 1, 2020." Wells Fargo goes on to state that the "account was last reported to the consumer reporting agencies on July 15, 2020, as current with no forbearance comment."

147.    As of August 6, 2020, Ms. Doctor's Equifax report still noted that her mortgage loan account was in forbearance for the months of May and June 2020.

### *Luis and Marisol Castro*

148.    Mr. and Mrs. Castro's mortgage loan, secured by a lien against their homestead property located at 3221 San Marcus Ave., Dallas, TX 75228, is a federally related mortgage loan backed by Fannie Mae and serviced by Wells Fargo.

149.    In late March, Mr. Castro went to Wells Fargo's website to pay their April 2020 mortgage payment.

150.    While Mr. Castro was on Wells Fargo's website, he noticed a large "box" on the website that referenced COVID-19 and contained a button marked "Get Help Now" for payment assistance.

151.    Mr. Castro was curious about what "payment assistance" would involve and clicked on the "Get Help Now" button on Wells Fargo's website, expecting more information about the various payment assistance options that might be available to him.

152.    Once Mr. Castro clicked that "Get Help Now" button, Wells Fargo's website displayed a message "congratulating" him and informing him that his loan has been enrolled in a forbearance plan.

153.    Mr. Castro did not receive any additional information at that time explaining the terms or the consequences of the forbearance program, and Mr. Castro assumed that being automatically enrolled in the program would not be detrimental to him or Mrs. Castro.

154.    Despite Wells Fargo placing Mr. and Mrs. Castro's loan account into a forbearance that he did not request, Mr. Castro proceeded to make his April 2020 payment that same day in late March.

155.    Wells Fargo accepted Mr. and Mrs. Castro's April 2020 mortgage payment.

156.    In late April, Mrs. Castro went to Wells Fargo's website to make their May 2020

mortgage payment but found that she was unable to log on to make the payment.

157.    Later that same day, Mrs. Castro called Wells Fargo and made the May 2020 mortgage payment by telephone. Wells Fargo accepted Mr. and Mrs. Castro's May 2020 payment.

158.    While speaking with the Wells Fargo representative in connection with their May 2020 mortgage payment, the Wells Fargo representative informed Mrs. Castro that she was unable to make her payment online because their loan was in forbearance status.

159.    Mrs. Castro did not understand at the time she was speaking with the Wells Fargo representative that having a loan in forbearance status could be harmful to her credit or otherwise, but Mrs. Castro also did not like being unable to make payments online. Accordingly, during her call in late April 2020, Mrs. Castro asked Wells Fargo's representative to remove whatever it was that was keeping her from making her payments online.

160.    Wells Fargo subsequently removed the restriction on Mr. and Mrs. Castro's account that prevented them from making their monthly mortgage payments online, and they have made their June – August 2020 mortgage payments.

161.    Wells Fargo did not remove Mr. and Mrs. Castro's mortgage loan from forbearance status in April 2020.

162.    In fact, Wells Fargo sent Mr. and Mrs. Castro a letter dated April 16, 2020, regarding the "short-term payment suspension." The April 16, 2020 letter stated: "This payment suspension option is based on an incomplete application for assistance. Other payment assistance options may be available. If you would like a review for all available assistance options, you may submit a complete application, which would include information about your income and expenses. This review is available whether or not you accept this short-term payment suspension. Please

contact us for more information."

163.    The April 16, 2020 letter also stated: "**Note:** If you find you don't need this short-term payment suspension, please continue to make your normal payments. Take advantage of this payment suspension only when you really need it, because you may need to repay any missed payments at the end of the short-term payment suspension period."

164.    Further, the April 16, 2020 letter did not disclose that the forbearance status of Mr. and Mrs. Castro's mortgage loan account would be reported to the credit reporting agencies or that Wells Fargo would suppress its reporting regarding the payments it was receiving from Mr. and Mrs. Castro during the forbearance period.

165.    In late May 2020, Mr. and Mrs. Castro decided to refinance their mortgage loan. At the time, Mr. and Mrs. Castro did not know or understand that Wells Fargo was reporting their mortgage loan to the credit reporting agencies as in forbearance status.

166.    Mr. and Mrs. Castro attempted to obtain a refinance but were unable to close on their refinance of their mortgage loan account in July 2020 because Wells Fargo had reported their mortgage loan account as in forbearance status.

167.    Moreover, due to the credit reporting of their loan as in forbearance preventing Mr. and Mrs. Castro from closing their refinance, Mr. and Mrs. Castro incurred a late fee for their July 2020 monthly mortgage payment because they anticipated that they would not have to make a mortgage payment in July 2020 due to their anticipated refinance.

168.    The tradelines for Mr. and Mrs. Castro's mortgage loan serviced by Wells Fargo on their TransUnion credit reports indicate in the "Remarks" section of the report that their mortgage loan account is in forbearance. Further, the "Terms" section of the report states "$0

per month for 360 months, Deferred" and Wells Fargo did not report that Mr. and Mrs. Castro made their April – June 2020 mortgage payments.

169. Similarly, the tradelines for Mr. and Mrs. Castro's mortgage loan serviced by Wells Fargo on their Equifax credit reports indicate in the "Comments 2" section that their mortgage loan account was in forbearance in April and May 2020 and the "Payment History" section does not indicate that Mr. and Mrs. Castro made their April – July 2020 monthly mortgage payments. Moreover, the "Terms Frequency" is listed as "DEFERRED" and the "Comments" section states their mortgage loan account is in forbearance.

170. The tradeline for Mr. and Mrs. Castro's mortgage loan serviced by Wells Fargo on Mrs. Castro's Experian report states the "Status" of the loan as "Open/Never late.  Deferred, payments begin Oct 2020," and states the monthly payment is "$0."  Further, the payment history section does not reflect Wells Fargo's receipt of Mr. and Mrs. Castro's April through June 2020 mortgage payments and the "Comment" section states "Account in Forbearance."

171. Wells Fargo sent Mr. and Mrs. Castro a letter dated July 9, 2020, which informed Mr. and Mrs. Castro that Wells Fargo had extended the forbearance period for another three months. The Castros did not consent to Wells Fargo's extension of the forbearance, which they had not wanted or authorized in the first place.

172. Mr. and Mrs. Castro then contacted Wells Fargo via telephone on multiple occasions in June and July of 2020, asking to be removed from the forbearance program.

173. On a call in late July 2020, Mr. Castro was informed by a Wells Fargo representative that the "Get Help Now" button was placed on Wells Fargo's website due to higher than normal call volume that resulted in five hour wait times before customers could speak to a Wells Fargo

representative.

174.    On August 3, 2020, Mr. Castro called Wells Fargo again in a further attempt to get his account removed from forbearance status. He spoke to four different Wells Fargo representatives and none of them were able to remove his loan from forbearance status. Ultimately, a Wells Fargo representative hung up on him.

### Barbara Prado

175.    Barbara Prado is a chef by trade. Until September 1, 2020, for eight years, she had been employed as a manager by the Bon Appetit cafe and restaurant chain, including throughout March 2020.

176.    Ms. Prado has two FHA mortgage loans that are serviced by Wells Fargo and are secured by her homestead property, which is located in Fremont, California.

177.    Ms. Prado's primary mortgage loan has an account number ending in 4898 (the "Primary Mortgage Loan").

178.    From April through September 2020, Ms. Prado's monthly payment on her Primary Mortgage Loan has been $1,594.70, which includes principal, interest, and escrow for property taxes and insurance.

179.    Ms. Prado was current on her Primary Mortgage Loan as of March 31, 2020, and Ms. Prado has made each monthly installment payment on her Primary Mortgage Loan from April through September 2020.

180.    Ms. Prado's secondary mortgage loan has an account number ending in 9035 (the "Secondary Mortgage Loan").

181.    The monthly payment on Ms. Prado's Secondary Mortgage Loan is $167.90.

182. Prior to April 2020, Ms. Prado had arranged for her payments on the Secondary Mortgage Loan to be automatically drafted from her bank account by Wells Fargo each month in the amount of $200.00, designating the $32.10 surplus to be applied to further reduce the loan's principal balance.

183. Ms. Prado called Wells Fargo on Saturday, March 28, 2020, to inquire about COVID-19 related payment assistance options with respect to her Primary Mortgage Loan only. Including hold time, Ms. Prado's March 28, 2020 call to Wells Fargo lasted approximately 43 minutes.

184. Ms. Prado does not recall or believe that she ever requested "forbearance" during her March 28, 2020 call with Wells Fargo and she does not recall authorizing Wells Fargo to place her Primary Mortgage Loan account into forbearance status effective April 1, 2020.

185. Wells Fargo sent Ms. Prado a letter dated September 4, 2020, in which Wells Fargo asserts that Ms. Prado called Wells Fargo regarding her Primary Mortgage Loan on March 28, 2020, "and stated that [Ms. Prado] would need two months deferred as [she] did not know when [she] would be going back to work."

186. Wells Fargo's September 4, 2020 letter does not assert that Ms. Prado ever requested "forbearance" as to her Primary Mortgage Loan, nor does it assert that Ms. Prado agreed on March 28, 2020 (or at any other time) to a "payment suspension" that would be immediately effective.

187. On September 15, 2020, a Wells Fargo representative, Erica Nosbisch, informed Ms. Prado that Wells Fargo placed her Primary Mortgage Loan account into forbearance status on March 30, 2020.

188.     Ms. Prado actually made her monthly mortgage payments on her Primary Mortgage Loan from April through September of 2020.

189.     In addition to placing Ms. Prado's Primary Mortgage Loan into forbearance following Ms. Prado's March 28, 2020 call, Wells Fargo placed Ms. Prado's Secondary Loan Account into forbearance status, without Ms. Prado requesting a forbearance on her Secondary Mortgage Loan and without her knowledge or consent.

190.     Wells Fargo's September 4, 2020 letter to Ms. Prado acknowledges that Wells Fargo placed Ms. Prado's Secondary Mortgage Loan into forbearance status without Ms. Prado's consent, "because of the request from [her] on [her Primary Mortgage Loan]. Due to high call volumes, the process was automated and forbearance assistance was provided for all accounts associated with [Ms. Prado's Primary Mortgage Loan]."

191.     When Wells Fargo placed Ms. Prado's Secondary Mortgage Loan into forbearance status, it also terminated the pre-arranged automatic electronic monthly payments that Ms. Prado had set up with Wells Fargo for her Secondary Mortgage Loan without prior notice to Ms. Prado.

192.     Because she had come to expect that the $200 monthly payment on her Secondary Mortgage Loan would be automatically drafted from her bank account each month, Ms. Prado did not notice that her Secondary Mortgage Loan payments to Wells Fargo for April, May, and June 2020 had not been drafted from her account.

193.     On June 10, 2020, at her daughter's urging, and with her daughter present, Ms. Prado called Wells Fargo to obtain information about the CARES Act forbearance program.

194.     During her June 10, 2020 call, after listening to a Wells Fargo representative's attempt to explain how the forbearance program would work, Ms. Prado informed Wells Fargo

that she was not interested in forbearance at that time.

195.    The Wells Fargo representative Ms. Prado spoke with on June 10, 2020 did not mention to Ms. Prado that both her Primary Mortgage Loan and her Secondary Mortgage Loan were already, or had already been, in forbearance.

196.    On July 9, 2020, Ms. Prado received an email from Wells Fargo informing her that Wells Fargo would be extending the forbearance term on her Secondary Mortgage Loan for an additional 90 days.

197.    Ms. Prado was alarmed by Wells Fargo's July 9, 2020 email extending the term of the unauthorized forbearance on her Secondary Mortgage Loan.

198.    Ms. Prado did not request that Wells Fargo extend the forbearance on her Secondary Mortgage Loan.

199.    On July 9, 2020, Ms. Prado attempted to call Wells Fargo to get information about why Wells Fargo was sending her an email that said her Secondary Mortgage Loan account was in forbearance status.  However, she was kept on hold for so long that it was interfering with her work and she ultimately was forced to hang up before she was able to speak with anyone at Wells Fargo.

200.    So, after getting off work on July 9, 2020, Ms. Prado went to a Wells Fargo branch bank to seek an explanation for Wells Fargo's email indicating that her Secondary Mortgage Loan was in forbearance.

201.    Upon Ms. Prado's arrival at the Wells Fargo branch bank at approximately 4:30pm on July 9, 2020, Ebonique Edogun, a Wells Fargo representative at the Wells Fargo branch banking location, attempted to assist Ms. Prado that evening by trying to call Wells Fargo's mortgage division to obtain information about the forbearance on the Secondary Mortgage Loan.

202.	Ms. Edogun's call to Wells Fargo on Ms. Prado's behalf remained on hold past the Wells Fargo branch bank's business hours, until approximately 5:30 p.m. Pacific time. At that point, Ms. Prado asked Ms. Edogun to end the call so they could both go home.

203.	The next morning, at approximately 5:30 a.m. Pacific time on July 10, 2020, Ms. Prado again called Wells Fargo to inquire about the July 9, 2020 email regarding extension of the forbearance on her Secondary Mortgage Loan.

204.	During the July 10, 2020 call, Ms. Prado first spoke with a Wells Fargo representative named Colleen, who later transferred Ms. Prado's call to a supervisor named Rosemary.

205.	While speaking with Colleen during the July 10, 2020 call, Ms. Prado learned, to her surprise, that her Primary Mortgage Loan was also in forbearance status.

206.	During the July 10, 2020 call, Ms. Prado also learned that her Secondary Mortgage Loan was three months behind because of the unauthorized forbearance on her Secondary Mortgage Loan account and Wells Fargo's undisclosed cancellation of her automatic electronic payment arrangement with Wells Fargo for the Secondary Mortgage Loan.

207.	While speaking with Rosemary during the July 10, 2020 call, Ms. Prado requested to have the forbearance removed from both loans.

208.	Rosemary, Wells Fargo's representative, advised Ms. Prado during the July 10, 2020 call that Ms. Prado would be able to defer the missed (forborne) payments on her Secondary Mortgage Loan to the end of her loan, and that this process would be done through correspondence Ms. Prado would receive by mail.

209.	Later in July, instead of offering to defer the missed (forborne) payments on her

Secondary Mortgage Loan, Wells Fargo sent Ms. Prado a letter dated July 13, 2020, informing Ms. Prado that she had an overdue balance on her Secondary Mortgage Loan account and requesting that Ms. Prado call Wells Fargo because "...we want to help you."

210. Ms. Prado made her July 2020 Secondary Mortgage Loan payment directly to Wells Fargo in the amount of $200, which Wells Fargo initially accepted and applied to Ms. Prado's Secondary Mortgage Loan account on July 14, 2020, designating $167.90 as the regular payment, and $32.10 as a principal payment, as reflected on the July 14, 2020 statement Wells Fargo sent Ms. Prado.

211. Wells Fargo then sent Ms. Prado a second statement in July 2020, dated July 16, 2020, which reverses the $32.10 that Wells Fargo applied as a principal payment on July 14, 2020, and places $32.10 into an unapplied funds account.

212. Wells Fargo also sent Ms. Prado a letter dated July 14, 2020, congratulating Ms. Prado because she was once again enrolled in monthly automatic payments for her Secondary Mortgage Loan, beginning August 14, 2020.

213. Wells Fargo next sent Ms. Prado a letter dated July 15, 2020 stating that her account was due for "3 payment(s) for the month(s) of May 1, 2020 through July 15, 2020 [sic] . . .." Wells Fargo's July 15, 2020 letter offers Ms. Prado various options to "help [her] stay in [her] home," none of which included deferral of her payments to the end of the note, as she had been told previously.

214. On July 22, 2020, Ms. Prado called Wells Fargo regarding her Secondary Mortgage Loan account because she was confused by Wells Fargo's correspondence, which did not comport with her prior conversation on July 10, 2020 with Wells Fargo's representative, Rosemary, in

which Rosemary informed Ms. Prado that the forborne payments on her Secondary Mortgage Loan would be put at the end of her loan.

215.    A Wells Fargo representative named Raphael spoke with Ms. Prado during the July 22, 2020 call. Raphael informed Ms. Prado that he could see no indication in Wells Fargo's system that Ms. Prado had requested forbearance on her Secondary Mortgage Loan and that a Wells Fargo representative named "Tayion Pugh" appeared to be the person who put the process in motion that resulted in Ms. Prado's Secondary Mortgage Loan account being placed into forbearance status. Raphael was not able to explain why the forborne (without authorization) payments on Ms. Prado's loan were not being deferred.

216.    On July 28, 2020, Ms. Prado accessed her Secondary Mortgage Loan account information through Wells Fargo's website in order to determine how much she would need to pay to bring her Secondary Mortgage loan current. According to Wells Fargo's website as of July 28, 2020, Ms. Prado was required to pay $610.40 to bring her loan current at that time.

217.    The next day, July 29, 2020, Ms. Prado went to a Wells Fargo branch bank and paid $610.40, believing that she was bringing her account contractually current.

218.    However, Wells Fargo has not treated Ms. Prado's Secondary Mortgage Loan account as contractually current subsequent to July 29, 2020, even though Ms. Prado has made her August and September monthly payments.

### Jorge Goytisolo, III

219.    Mr. Goytisolo's mortgage loan, secured by a lien against his homestead property located at 4306 Portola Ave., Los Angeles, CA 90032, is a federally related mortgage loan backed by Fannie Mae and serviced by Wells Fargo.

220.    Mr. Goytisolo did not request a forbearance of his mortgage loan from Wells Fargo.

221.    Mr. Goytisolo and his wife did contact Wells Fargo by telephone to obtain information about the CARES Act forbearance program. However, after learning that the CARES Act forbearance program would merely delay their monthly mortgage payment obligations, Mr. Goytisolo and his wife decided against the forbearance and specifically informed Wells Fargo that they did not want their loan to be placed into forbearance.

222.    Despite Mr. Goytisolo's and his wife's specific and unambiguous statements to Wells Fargo that she and Mr. Goytisolo did not want their loan to be put into forbearance, Wells Fargo placed their loan into forbearance status anyway.

223.    After putting Mr. Goytisolo's loan into forbearance status against his wishes, Wells Fargo furnished trade line information to the credit reporting agencies, indicating that Mr. Goytisolo's mortgage loan was in forbearance status.

224.    Mr. Goytisolo was current on his mortgage loan before he and his wife contacted Wells Fargo to inquire about the CARES Act forbearance program, and they have continued to make their ongoing monthly mortgage payments to Wells Fargo, on time and in full, ever since.

225.    However, in addition to reporting that Mr. Goytisolo's loan was in forbearance status, following Mr. Goytisolo's inquiry, from that point forward, Wells Fargo stopped reporting that it was receiving Mr. Goytisolo's monthly mortgage payments each month.

226.    Subsequent to their inquiry to Wells Fargo regarding information about CARES Act forbearances, Mr. Goytisolo and his wife have been attempting to refinance their mortgage loan in order to take advantage of the historically low interest rates that are currently available.

227.    Mr. Goytisolo and his wife discovered that Wells Fargo was reporting to the credit

reporting agencies that their loan was in forbearance when they applied to refinance their mortgage loan.

228. Indeed, Mr. Goytisolo has been unable to complete a refinance of his mortgage loan serviced by Wells Fargo precisely *because* Wells Fargo has been reporting the loan as being in forbearance status.

229. In the weeks since Mr. Goytisolo and his wife realized that their mortgage loan was placed in forbearance by Wells Fargo against their wishes, they have spent substantial time and resources in their efforts to have Wells Fargo correct their account and credit information.

230. Although Wells Fargo supposedly adjusted their account and credit reporting, Mr. Goytisolo and his wife have not received written confirmation from Wells Fargo regarding such supposed adjustments. They still have not had their refinance approved.

### Other Class Member Borrowers Similarly Affected

231. As reported by Gretchen Morgenson, borrowers in at least 14 different states have been placed in mortgage loan forbearances by Wells Fargo that they did not want or request. Gretchen Morgenson, *More Wells Fargo customers say the bank decided to pause their mortgage payments without asking*, NBCNews, July 22, 2020, https://www.nbcnews.com/business/personal-finance/more-wells-fargo-customers-say-bank-decided-pause-their-mortgage-n1234610.

232. NBCNews reports that Tammi Wilson ("Ms. Wilson") has a mortgage loan account that is serviced by Wells Fargo. In March 2020, Ms. Wilson checked the status of her mortgage loan account on Wells Fargo's website. While there, Ms. Wilson clicked on a link and provided contact information to receive information regarding COVID-19 payment assistance. *Id.*

233. When Ms. Wilson went to make her April 2020 mortgage payment online, she received a pop-up message stating she had no active accounts and could not make a payment. *Id.* Ms. Wilson later learned that Wells Fargo had placed her into a CARES Act forbearance without her knowledge. *Id.*

234. Ms. Wilson did not ask for the forbearance and continued to make her monthly mortgage payments. *Id.*

235. After spending hours on the phone with Wells Fargo representatives, Wells Fargo sent Ms. Wilson a letter dated July 1, 2020 confirming her request to opt out of the forbearance program. *Id.*

236. Despite opting out of the program, Ms. Wilson's recent credit report indicates that her mortgage loan is in forbearance and that her April and May payments were not credited to her account, even though Ms. Wilson submitted the payments. *Id.*

237. Also according to NBCNews, Eileen Roth, a Wells Fargo customer in New York, also received a forbearance that she did not want. *Id.* Ms. Roth was notified by Wells Fargo on June 22, 2020 that Wells Fargo had suspended the auto-draft of Ms. Roth's mortgage payments on March 20 due to the forbearance. *Id.* Ms. Roth's credit report also indicates that her mortgage loan account is in forbearance. *Id.*

238. In response to questioning by Ms. Morgenson, Wells Fargo's representative stated: "As soon as COVID began to impact our customers, Wells Fargo was intently focused on assisting any customers who needed help, and we have deferred 2.5 million payments for consumer and small business customers as a result. During the early stages of the crisis — even before the CARES act was passed — we provided relief to mortgage and home equity customers who we learned were

impacted by COVID over the phone, through our secure email channel, or through other means. Customers placed in forbearance received notices of that action through multiple channels, and we removed them from forbearance upon their request." *Id.*

239. According to the Consumer Financial Protection Bureau, a mortgage servicer is supposed to receive an attestation from a borrower of a COVID-19 related financial hardship prior to granting a forbearance. *Id.* However, upon information and belief, Wells Fargo does not require an attestation from borrowers, as neither Plaintiffs nor the borrowers featured in Ms. Morgenson's report provided an attestation to Wells Fargo.

## IV. CLASS ALLEGATIONS

240. Wells Fargo has placed loans of borrowers it services into forbearance status without its borrowers' consent.

241. Plaintiffs seek to represent the following classes:

**Nationwide Class:** Every person with residential property encumbered by a lien securing repayment of a loan serviced by Wells Fargo that, subsequent to March 26, 2020, Wells Fargo placed into a forbearance term or extended an existing term of forbearance without such person's consent.

**Virginia Class:** Every person with residential property located in Virginia encumbered by a lien securing repayment of a loan serviced by Wells Fargo that, subsequent to March 26, 2020, Wells Fargo placed into a forbearance term or extended an existing forbearance term without such person's consent.

**Florida Class:** Every person with residential property located in Florida encumbered by a lien securing repayment of a loan serviced by Wells Fargo that, subsequent to March 26, 2020, Wells

Fargo placed into a forbearance term or extended an existing term of forbearance without such person's consent.

**Texas Class:** Every person with residential property located in Texas encumbered by a lien securing repayment of a loan serviced by Wells Fargo that, subsequent to March 26, 2020, Wells Fargo placed into a forbearance term or extended an existing term of forbearance without such person's consent.

**California Class:** Every person with residential property located in California encumbered by a lien securing repayment of a loan serviced by Wells Fargo that, subsequent to March 26, 2020, Wells Fargo placed into a forbearance term or extended an existing term of forbearance without such person's consent.

242.     Nothing in the CARES Act or any other law or agreement between Plaintiffs (including the putative members of the class) and Wells Fargo authorizes Wells Fargo to unilaterally place borrowers' mortgage loan accounts into forbearance status without their consent.

243.     It is either Wells Fargo's explicit intent and policy to place borrowers' loans into forbearance without authorization or Wells Fargo has no policies and/or procedures in place to prevent it from placing loans into forbearance status without its borrowers' consent, or whatever policies and procedures Wells Fargo does maintain are either inadequate or are not enforced by Wells Fargo in a manner that is reasonably calculated to prevent Wells Fargo from placing loans into forbearance without borrowers' prior knowledge or consent.

### *Wells Fargo's Incentives & History of Similar Misconduct*

244. When it completes specified loan workout options with borrowers whose loans have been placed into forbearance pursuant to the CARES Act, Wells Fargo receives incentive payments from the various federal agencies on whose behalf Wells Fargo services such borrowers' mortgage loans.

245. For each loan placed into forbearance for which Wells Fargo subsequently defers repayment of some or all of the forborne payments until loan maturity in accordance with Fannie Mae and Freddie Mac's matrix for loan retention workout options, Wells Fargo receives an incentive fee of $500.

246. For each loan placed into forbearance for which Wells Fargo enters into a completed repayment plan in accordance with Fannie Mae and Freddie Mac's matrix for loan retention options Wells Fargo receives an incentive fee of $500.

247. Wells Fargo also receives servicing income for the loans it services, and Plaintiffs are informed and believe and therefore allege that Wells Fargo is therefore incentivized to modify its customers' mortgage loans following a CARES Act forbearance in a way that extends the loan's term and lowers the borrower's monthly mortgage payment in order to prevent "run off" of loan servicing rights, which occurs when borrowers sell their homes or refinance their mortgages. Thus, upon information and belief, Wells Fargo uses these false forbearance notices to increase its mortgage servicing income by lowering borrowers' monthly mortgage payments in order to keep them paying on their existing (albeit modified) mortgage loans.

248. Wells Fargo has previously engaged in similar conduct involving providing its borrowers with products and services that are detrimental to the borrowers, without such borrowers' prior knowledge or consent, including:

- Opening accounts for Wells Fargo customers without their knowledge or consent.

- Charging Wells Fargo auto lending customers for unnecessary insurance without their knowledge or consent.

- Filing Rule 3002.1 Notices of Mortgage Payment Change that falsely asserted that borrowers had agreed to mortgage loan modifications that the borrowers knew nothing about, including in the United States Bankruptcy Court for the Western District of Pennsylvania and in the United States Bankruptcy Court for the Western District of North Carolina.[2]

- In the United States Bankruptcy Court for the Western District of Virginia alone, Plaintiffs' counsel have identified at least eleven false forbearance notices Defendants have prepared, executed, filed, and served in debtors' Chapter 13 bankruptcy cases.

- In an article by Ms. Morgenson, published by NBC News on July 22, 2020 and discussed *supra*, numerous other instances of this same misconduct – placing loans into forbearance without borrower authorization - is described with respect to several borrowers, including Plaintiff Gerald Forsburg.

---

[2] In *In re Eyer*, the bankruptcy court for the Western District of Pennsylvania entered an order striking a notice of mortgage payment change related to a modification that the debtor did not request because the notice had "nothing to do with the [d]ebtor's current obligations under its note and/or mortgage with Wells Fargo." *In re Eyer,* Case No. 12-70985, Memorandum Order Striking Notice of Payment Change, Docket No. 93 (Bankr. W.D. Penn. Dec. 30, 2015). Further, Chief Bankruptcy Judge Beyer, in the Western District of North Carolina, entered an order in *In re Allen* regarding Wells Fargo's practice of filing Rule 3002.1 Notices of Monthly Mortgage Payment Change that falsely stated that borrowers' loans were subject to modifications that such borrowers had not requested and knew nothing about, a practice that Judge Beyer described as, "beyond the pale of due process." *In re Allen*, Case No. 13-31034, Order Sustaining Objection to Notice of Mortgage Payment Change, Docket No. 29 (Bankr. W.D. N.C. Sept. 19, 2016). Judge Beyer also entered an order sustaining a debtor's objection to a similar notice of mortgage payment change regarding a modification the debtor did not request, requiring Wells Fargo to pay the debtor's counsel's fees incurred for filing the objection. *See In re Roman*, Case No. 15-31462, Order Sustaining Objection to Notice of Mortgage Payment Change, Awarding Fees and Expenses to Debtor's Counsel to be Paid by Wells Fargo, and Setting Compliance Hearing for October 25, 2016, Docket No. 34 (Bankr. W.D. N.C. Oct. 14, 2016).

249.     In addition to the named Plaintiffs, Plaintiffs' counsel are aware of Wells Fargo engaging in similar conduct with respect to loans secured by properties of borrowers located in Alabama, Ohio, Oklahoma, Louisiana, Pennsylvania, Colorado, Delaware, Washington, Minnesota, California, Georgia, Texas, New Jersey, Missouri, Tennessee, New Hampshire, Florida, and Connecticut. Upon information and belief, Wells Fargo has been engaging in these same practices on a nationwide basis.

250.     Because Wells Fargo's wrongful conduct is widespread and uniform, this case should be certified for class action treatment pursuant to Fed. R. Civ. P. 23(a) and 23(b)(2) and (3).

251.     The classes Plaintiffs seek to represent exclude borrowers who have filed for bankruptcy protection under Chapter 13 of the United States Bankruptcy Code.

252.     The class does not include the Judges of this Court, the Judges of the United States Courts of Appeals, or the Justices of the United States Supreme Court.

253.     <u>Numerosity</u> – The class is so numerous, with class members throughout the country, that joinder of all class members is impracticable. A class action is the only feasible method of adjudicating the rights of the affected borrowers, and, absent allowance of a certification of a class action, a failure of justice will result. An investigation of Defendants' forbearance practices across the United States has revealed that Defendants are placing borrowers' loans into forbearance status without their consent on a nationwide basis. The number of putative class members that have already been identified is sufficient to justify further discovery to establish the numerosity element of Rule 23, as there are likely many more unidentified putative class members throughout the country.

254.    <u>Commonality</u> – The questions of law and fact common to all class members that predominate over those pertaining to individual class members include, but are not limited to, whether Wells Fargo engaged and engages in the policies and practices complained of and whether such actions violate federal and other common law duties, as alleged herein.

255.    Specifically, the common question of law for the nationwide class is whether Defendants' practice of placing loans into forbearance without borrowers' prior consent violates the CARES Act, RICO, RESPA, the Fair Credit Reporting Act, as well as whether such conduct constitutes Fraud, Breach of Contract, Negligence, Gross Negligence, and/or Defamation.

256.    The common question of law for the state subclasses is whether, under applicable state laws, members of such subclasses are entitled to additional recovery beyond the recovery available to other members of the nationwide class.

257.    The common facts are that Defendants have placed borrowers' loans into forbearance without consent to do so, and Defendants have falsely reported to the nation's credit reporting agencies that such loans were placed into forbearance at borrowers' request and have failed to report to the nation's credit reporting agencies that borrowers' loan payments have been received and applied despite having received such payments.

258.    <u>Typicality</u> – Plaintiffs' claims are typical of the claims of the class members.  All are based on the same factual and legal theories.  The Plaintiffs have been subjected to the same misconduct as the members of the proposed class.

259.    <u>Adequacy of representation</u> – Plaintiffs will fairly and adequately protect the interests of all class members and sub-class members.  Plaintiffs understand their responsibilities to the class as a whole and to the subclasses they represent, and Plaintiffs understand that

Defendants' practice of placing borrowers' loans into forbearance without borrower consent causes borrowers harm, aggravation, credit damage, risk of not being hired or of losing employment, risk of losing status or security clearance with employers, and can prevent borrowers from accessing the credit markets that would otherwise be available to them, including credit cards, refinance loans, unsecured lines of credit, home equity lines of credit, auto loans, denial of borrowers' ability to access, on their own terms, the forbearance relief available to them under the CARES Act, and other harmful consequences and damages resulting directly from Wells Fargo's unauthorized placement of borrowers' loans into forbearance status.

260.    Plaintiffs have retained capable counsel experienced in state and federal consumer law and consumer class-action litigation. Neither Plaintiffs nor their counsel have any conflicts that would interfere with the vigorous prosecution of this action.

261.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy in that:

(a) the class necessarily consists of persons who may be unaware of Wells Fargo's unauthorized and undisclosed placement of loans into forbearance status, who may not be aware of or capable of funding the cost of litigating individual actions against Wells Fargo,

(b) many class members lack the sophistication necessary to recognize Wells Fargo's unlawful placement of borrowers' loans into CARES Act forbearance status without authorization and/or the resources necessary to retain competent litigation counsel,

(c) many class members have acceded or will accede to Defendants' unlawful conduct, and

(d) there is no reason that the courts should be burdened with multiple lawsuits challenging Defendants' facially improper practice of placing borrowers' loans into forbearance without borrowers' consent.

262.     Defendants, in placing borrowers' loans into forbearance without borrowers' consent, have acted and refused to act on grounds generally applicable to the class as a whole.

## V. RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT ("RICO") ENTERPRISE ALLEGATIONS

263.     Plaintiffs repeat and reallege the allegations in this complaint.

### *The Enterprise*

264.     Defendants are all "persons" within the meaning of 18 U.S.C. § 1961(3).

265.     Based upon Plaintiffs' current knowledge, the following persons constitute a group of individuals associated in fact that will be referred to herein as the "Wells Fargo False Forbearance Enterprise:" (1) Wells Fargo, (2) vendors, including (without limitation) Black Knight, Inc. ("Black Knight"), and unknown website hosting, design, and tracking vendors, internet service providers, IVR system providers, and mail vendors who either directly assist or provide systems that assist Wells Fargo's false forbearance scheme, (3) the GSEs on whose behalf Wells Fargo services borrowers' loans, and (4) the GSE sponsored Trusts that own borrowers' loans (as to which Wells Fargo collects borrowers' payments and distributes them to the trusts), as well as the investors, sponsors, underwriters, brokers, attorneys, ratings agencies, accounting, and other individuals or entities responsible for , or assisting with, or participating in, directly or indirectly, the process of evaluating, marketing, and implementing the enterprise, who reap a portion of the proceeds Wells Fargo obtains in connection with its misconduct, or otherwise are compensated for their participation in the Wells Fargo False Forbearance Enterprise.

266. Upon information and belief, vendors involved in the Wells Fargo False Forbearance Enterprise provide Wells Fargo with services and/or assistance with, or otherwise participate in the enterprise by (a) identifying accounts of borrowers for placement into forbearance status; (b) preparing and mailing and/or emailing correspondence related to borrowers' accounts that have been placed into forbearance status without their consent; (c) communicating information to credit reporting agencies related to accounts that Wells Fargo has placed into forbearance status without borrowers' prior consent, and/or reporting such information once communicated by Wells Fargo through or with the assistance of other participants in the Wells Fargo False Forbearance Enterprise, (d) assisting Wells Fargo with loan workout options to address the mortgage arrearages resulting from Wells Fargo's unauthorized placement of borrowers' loans into forbearance status, and (e) providing loans and/or access to capital Wells Fargo uses to repurchase loans from GSEs and their investors that Wells Fargo placed in forbearance status without borrowers' consent.

267. The Wells Fargo False Forbearance Enterprise is an ongoing organization that engages in, and whose activities affect, interstate commerce.

268. The members of the Wells Fargo False Forbearance Enterprise function as a continuing unit and share the common purpose of maximizing their profits by placing loans of the Plaintiffs and class members into forbearance status without authorization.

269. The Wells Fargo False Forbearance Enterprise has a systematic linkage because there are contractual relationships, agreements, financial ties, and coordination of activities between Defendant Wells Fargo, Wells Fargo's other corporate affiliates and subsidiaries, Black Knight, Experian, TransUnion, Equifax, Fannie Mae, Freddie Mac, Ginnie Mae, InfoEx, various

law firms, print and mailing vendors, internet service providers, brokers, investment bankers, rating agencies, accountants, servicers, sponsors, underwriters, and other entities participating in conducting the affairs of the enterprise. Wells Fargo, Experian, Equifax, Transunion, Fannie Mae, Freddie Mac, Ginnie Mae, InfoEx, various law firms, and print and mailing vendors use Black Knight's MSP mortgage loan servicing system and associated communication network as a common mortgage loan servicing, communication, and accounting system of record to store and communicate data related to the accounts of borrowers whose loans Wells Fargo places into forbearance without borrowers' prior knowledge or consent.

270.    While Defendants participate in and are members and part of the Wells Fargo False Forbearance Enterprise, they also have an existence separate and distinct from the enterprise.

271.    Defendants control, operate, and direct the affairs of the Wells Fargo False Forbearance Enterprise by, among other things determining that borrowers' accounts should be placed into forbearance status; programming their computer systems to generate, store, and communicate information related to the identification of and subsequent treatment of loans placed into forbearance without borrowers' consent; mailing borrowers correspondence regarding loans placed into forbearance without borrowers' authorization, repurchasing loans placed into forbearance without borrower consent on the false pretext that the loans are in default because they are in forbearance status, even when the loans in question are actually performing loans; furnishing false information to the credit reporting agencies indicating that loans are in forbearance and withholding information regarding borrower payments received and applied during forbearance periods borrowers did not request.

272.    The Wells Fargo False Forbearance Enterprise has an ascertainable structure separate and apart from the pattern of racketeering activity in which the Defendants engage.

### *Predicate Acts*

273.    § 1961(1) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Defendants have engaged, and continue to engage, in conduct violating each of these laws in order to effectuate their scheme.

### *Violations of 18 U.S.C. § 1341 and 18 U.S.C. § 1343*

274.    As alleged herein, for the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations, or promises, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service or commercial interstate carriers, including but not limited to correspondence and electronic communication with borrowers, the GSEs, print and mail vendors, and the credit reporting agencies regarding loans placed into forbearance without borrowers' authorization, as well as correspondence regarding proposed loan workout options, credit reporting, investor reporting, payment distributions, workout incentive compensation, loan buybacks and/or suspension of principal and interest advance obligations, among other things.

275.    For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, the Defendants, in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things,

including but not limited to loan data, proposed loan modification terms, agreements, email correspondence, monthly mortgage statements, telephone correspondence, credit reporting information, investor reporting, and made or caused to be made false statements over the telephone, facsimile, electronic mail, and the internet.

276.    The matter and things sent by Defendants via the Postal Service, commercial carrier, wire, or other interstate electronic media included, inter alia: false reports to credit reporting agencies that borrowers requested forbearance and/or failure to report and/or disclose payment receipts; false, deceptive and misleading written correspondence with borrowers; email correspondence; misleading websites and mobile device electronic user interfaces that place borrowers into forbearance with the click of a single button without warning or explanation, as well as other data used to place accounts into forbearance status and/or to inform third parties of borrowers' loans that Wells Fargo placed into forbearance status without borrowers' consent; agreements; monthly mortgage statements; investor reporting; correspondence; and payments.

277.    Other matter and things sent through or received via the Postal Service, commercial carrier, wire, or other interstate electronic media by Defendants include information or communications in furtherance of or necessary to effectuate the scheme.

278.    Defendants' misrepresentations, acts of concealment, and failures to disclose were knowing and intentional and made for the purpose of deceiving borrowers, the GSEs, investors in GSE-backed trusts, the credit markets, equity and debt investors in Wells Fargo, and other persons, regulators, and entities to conceal or perpetuate Wells Fargo's unlawful scheme.

279.    Because this is a class action, and there were numerous acts of mail and wire fraud that were used to carry out the scheme, it would be impracticable for Plaintiffs to plead all details

of the scheme with particularity. Therefore, Plaintiffs cannot plead the precise dates of all of Defendants' use of the U.S. mail and interstate wire facilities, and corresponding acts of mail and wire fraud, as this information cannot be alleged without access to Defendants' records.

280.    Defendants either knew or recklessly disregarded the fact that the misrepresentations and omissions described above were material, and the GSEs, their investors, Defendants' debt and equity investors, the credit reporting agencies, and participants in credit markets that rely on the integrity of credit information, as well as the Plaintiffs and the other members of the class, relied upon or were injured by others' reliance upon the Defendants' misrepresentations and omissions.  Had the GSEs and their investors, Wells Fargo's debt and equity investors, the participants in the credit markets, and Plaintiffs and other members of the class known the truth that Wells Fargo's placement of loans into forbearance status without borrower authorization was used as a profit center and/or unlawful loss mitigation hedge, rather than to effectuate bona fide, authorized, requested, agreed, and lawful agreements regarding the mortgage payment obligations of Plaintiffs and other members of the class, they would have immediately rejected and disregarded Defendants' misconduct.

### *Pattern of Racketeering Activity*

281.    The Defendants have engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing at least two acts of racketeering activity, i.e. indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past four years.

282.    Defendants did not begin placement of borrowers' mortgage loans into unauthorized CARES Act forbearances until on or after March 27, 2020, when the CARES Act was passed by Congress, which is within four years of Plaintiffs' filing of their original complaint in this case.

283.    Each of the Defendants has committed numerous acts of racketeering activity. Each act of racketeering activity was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results and impacted similar victims, including Plaintiffs and the other class members.

284.    The multiple acts of racketeering activity that Defendants committed were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

## VI.  CAUSES OF ACTION

### COUNT I
### VIOLATION OF RICO 18 U.S.C. § 1962(c)

285.    Plaintiffs repeat and reallege the allegations in this complaint.

286.    This claim for relief arises under 18 U.S.C. § 1964(c).

287.    § 1962(c) of RICO provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ."

288.    Through the pattern of racketeering activities outlined above, the Defendants have conducted and participated in the affairs of the Wells Fargo False Forbearance Enterprise.

289.    Each of the Defendants agreed to participate, directly or indirectly, in the conduct of the affairs of the Wells Fargo False Forbearance Enterprise through a pattern of racketeering activity comprised of numerous acts of mail fraud and wire fraud, and each Defendant so participated in violation of 18 U.S.C. § 1962(c).

290.    As set forth above, Defendants have violated 18 U.S.C. § 1962(c) by conducting, or participating directly or indirectly in the conduct of, the affairs of the Wells Fargo False Forbearance Enterprise through a pattern of racketeering.

291.    As a direct and proximate result, Plaintiffs and class members have been injured in their business or property or both by the predicate acts, which make up the Defendants' patterns of racketeering activity.

292.    Specifically, and as set forth elsewhere herein, Plaintiffs and class members, the integrity of the housing market and consumer credit markets, as well as GSE-sponsored mortgage trusts, have been injured by Defendants in their business or property in a variety of ways, including by Wells Fargo actively undermining Plaintiffs' and the other class members' ability to pay their mortgages without unlawful interference by Wells Fargo in the form of placing borrowers' loans into forbearance status without prior authorization.

293.    Plaintiffs and the other class members have also been injured in that their mortgage loans have been unlawfully subjected to the risk that they could be treated as being in contractual default as a result of Defendants' unauthorized forbearances and/or by the harm to borrowers' credit that results from having a mortgage loan that is improperly designated as being in forbearance status.  Additional harms include threats to borrowers' ability to obtain, advance in, or maintain employment and/or loss of stature and other reputational damage to affected

borrowers, denial of credit applications and/or obtaining higher cost credit than borrowers would ordinarily be entitled to obtain, freezing of accounts and loss of access to credit, cancellation of loan modifications in process and/or cancellation of completed and final loan modifications, and other economic harms, as well as needless aggravation, frustration and outrage over Defendants' misconduct, which Plaintiffs and other class members did nothing to provoke.

294.    Plaintiffs were injured by Wells Fargo's material omissions of fact and fraudulent placement of their loans into forbearance status, including the cancellation of Plaintiff Forsburg's mortgage modification, credit damage, lost profits, loss of access to credit markets and/or home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages.

**COUNT II**
**(FRAUD)**

295.    Plaintiffs repeat and reallege the allegations in this complaint.

296.    Wells Fargo made material omissions of fact in failing to disclose to Plaintiffs that it had placed their loans into forbearance without their consent.

297.    Plaintiffs detrimentally relied upon Wells Fargo's material omissions of fact when they did not inform Plaintiffs promptly that their accounts had been placed in forbearance and Plaintiff Forsburg did not challenge the forbearance to preserve his modification.  Moreover, Plaintiffs Doctor and Castro and other class members continued to make their monthly mortgage payments with the understanding and expectation that doing so would result in their loans being serviced in the ordinary course of business without the consequences associated with having a loan characterized as being in forbearance status.

298.     Plaintiffs' reliance on Wells Fargo's material omissions of fact was justified and reasonable, as Plaintiffs were performing under their mortgage loans and had no basis to assume and were not on notice that Wells Fargo would defraud them by placing their loans into forbearance status without authorization, and no common law, statute, or other agreement among Plaintiffs and their mortgage lender and/or Wells Fargo authorized Wells Fargo to place borrowers' loans into forbearance without their consent.

299.     Plaintiffs were injured by Wells Fargo's material omissions of fact and fraudulent placement of their loans into forbearance status, experiencing cancellation of Plaintiff Forsburg's mortgage modification, denial of Plaintiff Doctor's home equity line of credit application, denial of Mr. and Mrs. Castro's refinancing application, credit damage, loss of access to new credit and existing credit cards and home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages.

## COUNT III
### (VIOLATIONS OF THE TRUTH IN LENDING ACT & REAL ESTATE SETTLEMENT PROCEDURES ACT)

300.     Plaintiffs repeat and reallege the allegations in this complaint.

301.     As discussed above, mortgage servicers are responsible for collecting and processing mortgage payments received from borrowers.  Any delay in processing payments can result in unwarranted late fees and/or unjustified claims of borrower default.

302.     Complaints about slow payment processing led the Federal Reserve Board in 2008 to promulgate a rule requiring mortgage servicers to credit payments to consumers' accounts as of the date of receipt.  Reg. Z, 12 CFR § 1026.36(c)(1)(i); 73 Fed. Reg. 44,522 (July 30, 2008). Section 1464 of the Dodd-Frank Act, enacted in 2010, essentially codified the FRB rule, and the CFPB

finalized regulations implementing the prompt crediting provision of the Dodd-Frank Act. See 78

Fed. Reg. 10,902 (effective Jan. 10, 2014).

303.     The Dodd-Frank Act amendments to the Truth in Lending Act ("TILA") also

mandate that servicers credit periodic payments on consumer credit transactions secured by a

consumer's principal dwelling as of the date of receipt. Like the FRB rule, there is an exception

when a delay in crediting the payment does not result in any charge to the consumer or in the

reporting of negative credit information to a consumer reporting agency. These statutory

requirements were implemented through regulations that became effective on January 10, 2014. 15

USC 1639f(a).

304.     The Official Interpretations to Regulation Z provide guidance on the exception

permitting a delay in posting if there are no negative consequences to the consumer:

> Under § 1026.36(c)(1)(i), a mortgage servicer must credit a payment to a
> consumer's loan account as of the date of receipt. This does not require that a
> mortgage servicer post the payment to the consumer's loan account on a particular
> date; the servicer is only required to credit the payment *as of* the date of receipt.
> Accordingly, a servicer that receives a payment on or before its due date (or within
> any grace period), and does not enter the payment on its books or in its system until
> after the payment's due date (or expiration of any grace period), does not violate
> this rule as long as the entry does not result in the imposition of a late charge,
> additional interest, or similar penalty to the consumer, or in reporting of negative
> information to a consumer reporting agency.

Official Interpretations to Reg. Z, ¶ 36(c)(1)(i)-1 (emphasis in original).

305.     There is no exception to the prompt crediting rules when the borrower is in

bankruptcy or in a trial loan modification. There is also no specific exception to the rule for small

servicers. See 78 Fed. Reg. 10,902, 10,956 (Feb. 14, 2013).

306.     The requirements of TILA typically do not directly apply to loan servicers.

However, because 12 C.F.R. § 1024.36(b)(3) of the Real Estate Settlement Procedures Act

("RESPA") specifically identifies a violation of TILA under 12 C.F.R. § 1026.36(c)(1) as an error relating to the servicing of a borrower's mortgage loan, failure to comply with TILA's requirement that payments be credited as of the date of receipt is a RESPA violation.

307.     Upon information and belief, Wells Fargo has placed Plaintiffs' mortgage loan accounts into forbearance and/or extended existing forbearance periods without Plaintiffs' knowledge, consent, or approval and violated RESPA and TILA by failing to apply Plaintiffs' monthly mortgage payments as of the date they came due and failing to report publicly that payments made by Plaintiffs have actually been received and applied.

308.     Upon information and belief, Wells Fargo has demonstrated a pattern and practice of failing to comply with Regulations X and Z because Wells Fargo has engaged in this practice of placing borrowers in unwanted and unauthorized forbearance agreements on a nationwide basis.

309.     As a result, Plaintiffs have been injured as a result of Wells Fargo's failure to comply with the requirements of RESPA and TILA.  Plaintiffs have experienced cancellation of a mortgage modification, credit damage, loss of access to credit markets and/or home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages.

310.     Accordingly, Wells Fargo is liable to Plaintiffs for actual damages, costs, attorneys' fees, and statutory damages of at least $2,000.00 per violation, pursuant to 12 U.S.C. § 2605.

## COUNT IV
## (VIOLATIONS OF THE FAIR CREDIT REPORTING ACT)

311.     Plaintiffs repeat and reallege the allegations in this complaint.

312.     Plaintiff Jenna Doctor is a "consumer" as that term is defined by 15 U.S.C. § 1681a(c).

313.    Wells Fargo is a "furnisher" of consumer information as defined by 12 CFR 1022.41(c) and as described throughout the Fair Credit Reporting Act ("FCRA"), as Wells Fargo regularly reports consumer account information to the Credit Reporting Agencies for inclusion in credit reports.

314.    Wells Fargo willfully violated 15 U.S.C. § 1681s-2(b) by failing to adequately investigate and correct inaccurate credit reporting information with the Credit Reporting Agencies following Plaintiff Jenna Doctor's formal reinvestigation requests with the Credit Reporting Agencies under 15 U.S.C. § 1681i.

315.    Plaintiffs and the putative class members in this case have had their credit information compiled and furnished by Wells Fargo regarding their mortgage loans indicating falsely that Plaintiffs' and the putative class members' loans are in forbearance when Plaintiffs and the putative class members did not request forbearance.

316.    Wells Fargo also failed to furnish information to the Credit Reporting Agencies regarding payments Plaintiffs and the putative class members in this case made on their mortgage loans during the period in which Plaintiffs' and the putative class members' loans were reported improperly as being in forbearance status.

317.    Wells Fargo knew, or should have known, that Plaintiffs and the class members did not request or affirmatively consent to the mortgage loan forbearances that Wells Fargo reported to the Credit Reporting Agencies.

318.    Despite the fact that Wells Fargo knew or should have known that it placed borrowers into mortgage forbearances that they did not request or consent to, Wells Fargo had a

policy of reporting the forbearance in the comments section of Plaintiffs' and the class members' credit reports.

319.     The forbearance notation on the class members' credit reports clearly indicates to potential creditors or other third parties that the class members experienced some sort of financial hardship.  These forbearance notations adversely affect class members' ability to obtain credit.

320.     Wells Fargo knew that the presence of the forbearance notations in the class members' credit reports would damage the class members' ability to obtain new credit, which may be essential to a consumer's daily life.

321.     Wells Fargo's failure to report its receipt of payments made by Plaintiffs and the class members during the period in which Wells Fargo improperly furnished information to the Credit Reporting Agencies indicating that their loans were in forbearance status also adversely affects Plaintiffs' and the class members' ability to obtain credit, including but not limited to preventing and/or significantly impeding borrowers' ability to refinance their home mortgage loans and/or to borrower against the equity in their homes, as experienced by Ms. Doctor and Mr. and Mrs. Castro.

322.     Wells Fargo has chosen to inaccurately report that Plaintiffs' and the class members' mortgage loan accounts were in forbearance and to falsely report "no data" or other indication that fails to reflect Wells Fargo's receipt of payments during the period in which Wells Fargo improperly treated the loan as being in forbearance.

323.     Wells Fargo received notice of Plaintiff Doctor's dispute from the Credit Reporting Agencies and either (1) failed to reasonably investigate the dispute or (2) investigated the dispute

and incorrectly determined that it had been accurately reporting Plaintiff Doctor's and the class members' mortgage loan account.

324.     Ms. Doctor disputed Wells Fargo's credit reporting with Equifax on or about July 7, 2020.

325.     Ms. Doctor disputed Wells Fargo's credit reporting with Equifax again on or about July 16, 2020, and Equifax began a re-investigation of Ms. Doctor's dispute of Wells Fargo's reporting her mortgage loan account as in forbearance status.

326.     Ms. Doctor submitted dispute letters to the Credit Reporting Agencies on July 31, 2020, disputing Wells Fargo's reporting of her mortgage loan account as "in forbearance" when Ms. Doctor never requested or authorized such forbearance.

327.     Wells Fargo received an inquiry from each credit reporting agency as part of the Credit Reporting Agencies' investigation into each dispute submitted by Ms. Doctor.

328.     Wells Fargo failed to adequately investigate Ms. Doctor's disputes raised in her letters to the Credit Reporting Agencies.

329.     Upon information and belief, Wells Fargo failed to review all relevant information provided by the Credit Reporting Agencies and by Ms. Doctor in relation to each dispute sent to the Credit Reporting Agencies by Ms. Doctor.

330.     Wells Fargo failed to conduct and report the results of a complete investigation into each dispute raised by Ms. Doctor.

331.     Wells Fargo failed to promptly delete, modify, or block reporting of inaccurate, incomplete, or unverifiable information in response to each dispute raised by Ms. Doctor.

332.    Wells Fargo failed to fully correct the information it supplied to the Credit Reporting Agencies regarding Ms. Doctor's account.

333.    Wells Fargo has also breached its duties as set forth in 15 U.S.C. § 1681s-2(a) by failing to adequately investigate and fully correct inaccurate credit reporting information with the Credit Reporting Agencies following Ms. Doctor's dispute of the credit reporting errors.

334.    In the event that Wells Fargo submitted corrections to the Credit Reporting Agencies regarding Ms. Doctor's account, it failed to correct its own records such that it would prevent re-reporting of the incorrect information in subsequent automatic system submissions to the Credit Reporting Agencies.

335.    Ms. Doctor has incurred actual damages and has suffered physically, mentally, and emotionally as a result of Wells Fargo's willful violations of the Fair Credit Reporting Act.

336.    Based on Wells Fargo's violations of 15 U.S.C. § 1681s-2(b), Plaintiffs and the class members are entitled to actual damages, costs, and attorneys' fees pursuant to 15 U.S.C. § 1681o.

337.    Moreover, as a result of each and every negligent violation of the FCRA, Plaintiffs and the class are entitled to statutory damages and reasonable attorneys' fees pursuant to 15 U.S.C. § 1681o.

338.    Plaintiffs and the class members are also entitled to statutory damages, punitive damages, and reasonable attorneys' fees for each and every of Wells Fargo's willful violation of the FCRA pursuant to 15 U.S.C. § 1681n(a).

### COUNT V
### (VIRGINIA COMMON LAW CIVIL CONSPIRACY)
### (AS TO PLAINTIFF FORSBURG AND THE VIRGINIA CLASS MEMBERS)

339.    Plaintiffs repeat and reallege the allegations in this complaint.

340. As alleged herein, with respect to Plaintiff Gerald Forsburg and members of the Virginia class, Defendants and the members of the Wells Fargo False Forbearance Enterprise constitute a combination of two or more persons.

341. The purpose of the Wells Fargo False Forbearance Enterprise is to accomplish, by concerted action, the unlawful purpose of obtaining loan workout compensation and/or of profiting from repurchasing borrowers' mortgage loans from the FHA and/or its investors based on false representations that borrowers' loans were in forbearance, profit by preventing financial losses associated with "loan runoff" (loss of income from borrowers' loans) with respect to borrowers who would otherwise have refinanced their loans, and/or to profit by securitizing the repurchased loans that Wells Fargo falsely represents to be in forbearance status, through the unlawful means of misrepresenting to investors, government agencies, credit reporting agencies, and those businesses and individuals who rely on the information reported by the credit reporting agencies, that borrowers' loans were in forbearance status at the borrowers' request.

342. Including all other applicable damages alleged herein, Plaintiff Forsburg and the members of the Virginia class have been damaged as a result of Defendants' acts in furtherance of Wells Fargo False Forbearance Enterprise by:

- Incurring damage to reputation, loss of access to credit, denial of credit, denial of employment, loss of employment, demotion of employment or loss of promotion, denial of security clearances, and other harmful consequences of having false and harmful information reported to the Credit Reporting Agencies by Wells Fargo, which information actually appeared on their credit reports regarding their mortgage loans.

- Harm to credit has been compounded by Wells Fargo's refusal to update and correct its false credit reporting regarding payments Wells Fargo accepted and applied to accounts of borrowers whose loans were placed in forbearance without their consent, when Wells Fargo should have been removing the special comment code falsely indicating the loan is in forbearance or any other distressed status, and by furnishing accurate information regarding Plaintiffs' and the other class members' monthly

mortgage payments to the credit reporting agencies that were suppressed while the borrowers' loans were being treated as being in forbearance without the borrowers' consent.

- Being deprived of positive and accurate information Wells Fargo would otherwise have reported to the Credit Reporting Agencies, which Wells Fargo withheld solely because it was reporting these borrowers' loans as being in forbearance status.

- Being deprived of access to the CARES Act's forbearance provisions by being unwittingly forced into forbearance without their consent, thereby consuming months of available forbearance and preventing borrowers from subsequently requesting to have their loans placed into forbearance, as the CARES Act contemplates.

343. Plaintiff Gerald Forsburg and the members of the Virginia class are entitled to damages, including actual damages, punitive damages, and attorneys' fees as a result of Defendants' actions as described herein.

## COUNT VI
## (VIOLATIONS OF VIRGINIA'S BUSINESS CONSPIRACY STATUTE)
## (AS TO PLAINTIFF FORSBURG AND THE VIRGINIA CLASS MEMBERS)

344. Plaintiffs repeat and reallege the allegations in this complaint.

345. As alleged herein, with respect to Plaintiff Gerald Forsburg and the members of the Virginia Class, Defendants and the other participants in the Wells Fargo False Forbearance Enterprise constitute a combination of two or more persons.

346. Among other things, one purpose of the Wells Fargo False Forbearance Enterprise was to willfully or maliciously injure Plaintiff Forsburg's and the Virginia Class members' reputation, trade, business, or profession.

347. As alleged herein, Plaintiff Forsburg and the other members of the Virginia class were damaged as a result of the conduct of the Wells Fargo False Forbearance enterprise in placing borrowers' accounts into forbearance status without their authorization and falsely representing to credit reporting agencies, Fannie Mae, Freddie Mac, Ginnie Mae, and/or the FHA, USDA, or VA

and any investors having an interest in such borrowers' loans that such loans were in forbearance status.

348.     Wells Fargo attempted to conspire with one or more of the other participants in the Wells Fargo False Forbearance Enterprise for the purpose of benefitting financially by obtaining loan workout incentive compensation, avoiding principal and interest advance obligations, and preventing loan runoff by preventing borrowers from refinancing their loans, while willfully disregarding the rights of Plaintiff Forsburg and the members of the Virginia class, despite having knowledge of the fact that placing loans into forbearance status would unfairly harm Plaintiff Forsburg and the other Virginia class members, who had not requested that their loans be placed into forbearance status.

349.     Wells Fargo acted with legal malice toward Plaintiff Forsburg and the members of the Virginia class by disregarding and/or intentionally inflicting reputational and credit-related damages that Wells Fargo knew would result from its placement of borrowers' loans into forbearance status.

350.     Wells Fargo's own website reveals that Wells Fargo is already conscious of many undesirable consequences of forbearances for borrowers. These include escrow shortages (because the escrow portion of forborne payments is not subject to deferral) and resulting payment increases, cancellation of mortgage modifications-in-progress, temporary inability to refinance loans that have been in forbearance, loss of access to credit, including inability to access existing lines of credit and home equity loans, and inability to get new unsecured loans and credit cards. https://update.wf.com/coronavirus/home-lending/. Additionally, when Wells Fargo places a borrower's account into forbearance status, Wells Fargo also cancels the borrower's pre-arranged

automatic payments and cuts off the borrower's access to Wells Fargo's online mortgage payment applications, requiring the borrower to pay by telephone or by mail to Wells Fargo, all without prior notice to the borrower. This practice can result in borrowers incurring late fees, unanticipated arrearages, and can compromise the ability of Chapter 13 debtors to manage their budgets.

351. Wells Fargo's false forbearance notices purport to be retroactive to months that have already come due, including monthly payments that Wells Fargo has already collected. So, without authorization, Wells Fargo is depriving borrowers of the full relief the CARES Act would grant them in the event they later decide to accept a forbearance, reducing the available forbearance period to which they would otherwise be entitled under the CARES Act.

352. The conspiratorial actions of the participants in the Wells Fargo False Forbearance Enterprise caused Plaintiff Forsburg and the other Virginia class members to suffer damages, including reputational damage, credit harm, loss of credit opportunity, injury to trade, business, or profession, mental anguish, and emotional distress.

353. Because of Wells Fargo's violation of Virginia's civil conspiracy statute, the members of the Virginia class have incurred and are entitled recover treble their damages, including lost profits, as well as their reasonable attorneys' fees and costs of this litigation.

354. Because of Wells Fargo's violation of Virginia's civil conspiracy statute, the members of the Virginia class are entitled to an injunction prohibiting Wells Fargo from engaging in the practices and conduct complained of herein.

**COUNT VII**
**(VIOLATION OF THE TEXAS DEBT COLLECTION ACT ("TDCA"))**
**(ON BEHALF OF PLAINTIFFS MR. AND MRS. CASTRO AND THE TEXAS CLASS)**

355. Plaintiffs repeat and reallege the allegations in this complaint.

356.     Plaintiffs Mr. and Mrs. Castro are "consumers" as that term is defined by the Texas Debt Collection Practices Act, set forth in Chapter 392 of the TEX. FIN. CODE (the "TDCA").

357.     Mr. and Mrs. Castro's relationship with the Defendants arose out of a "consumer debt" as that term is defined in the TDCA.

358.     Defendants regularly collect consumer debts and are a "debt collector" as that term is defined in the TDCA.

359.     Defendants violated § 392.304(19) of the TDCA because they misrepresented to the credit reporting agencies that Mr. and Mrs. Castro's mortgage loan account was in forbearance status when Mr. and Mrs. Castro never consented to the alleged forbearance.

360.     Moreover, Defendants' failure to provide any meaningful disclosure relating to the terms and consequences of being enrolled in the COVID-19 forbearance program before placing Mr. and Mrs. Castro's mortgage loan into the program without Mr. and Mrs. Castro's consent was deceptive.

361.     As alleged above, Defendants made misrepresentations to the credit bureaus that the Texas class members' mortgages were in forbearance when members of the Texas class did not consent to the alleged forbearance.  Further, Defendants failed to provide any meaningful disclosure relating to the terms and consequences of being enrolled in the COVID-19 forbearance program before placing the Texas class members' mortgage loans into forbearance without their consent.

362.     Mr. and Mrs. Castro and the members of the Texas class have suffered actual damages, including loss of credit, out-of-pocket expenses, and attorneys' fees, amongst others, and

have suffered physically, mentally, and emotionally as a result of Defendants' violations of the TDCA.

363.    Defendants violated the TDCA and Mr. and Mrs. Castro and the members of the Texas class are thus entitled to their actual damages, attorneys' fees, and injunctive relief pursuant to § 392.403 of the TDCA.

## COUNT VIII
### (VIOLATION OF THE FLORIDA CONSUMER COLLECTIONS PRACTICES ACT ("FCCPA"))
### (ON BEHALF OF PLAINTIFF JENNA DOCTOR AND THE FLORIDA CLASS)

364.    Plaintiffs repeat and reallege the allegations in this complaint.

365.    Plaintiff Jenna Doctor is a "consumer," as she is a natural person obligated to pay a debt on her homestead property.

366.    The debt which Defendants attempted to collect was a "consumer debt" within the meaning of § 559.55(1) of the FCCPA, as Ms. Doctor's mortgage debt in question arises out of debt incurred for family or household purposes.

367.    Defendants violated § 559.72(5) of the FCCPA when Defendants represented to the credit reporting agencies that Ms. Doctor's mortgage loan account was in forbearance, when Ms. Doctor did not, in fact, consent to the placement of her account into forbearance status. Defendants knew that the information they reported to the credit reporting agencies was false because Defendants knew Ms. Doctor did not consent to the placement of her account in forbearance when it made each representation to the credit reporting agencies.

368.    As alleged above, Defendants made representations to the credit reporting agencies that the mortgage loan accounts of the members of the Florida class were in forbearance when the members of the Florida class did not request or consent to the forbearance, and Defendants knew

that the information it reported to the credit reporting agencies regarding the Florida class members' mortgage loan accounts was false.

369. Defendants' representations to the credit reporting agencies regarding Ms. Doctor and the members of the Florida class harmed Ms. Doctor's and the Florida class members' reputations. Specifically, due to Defendants' representations to the credit reporting agencies that Ms. Doctor's mortgage loan account was in forbearance, Ms. Doctor's application for credit was denied.

370. Pursuant to § 559.77(2) of the FCCPA, Ms. Doctor is entitled to her actual damages, statutory damages of $1,000.00, and her reasonable attorneys' fees and costs. The members of the Florida class are entitled to statutory damages in the amount of $500,000 or 1% of the Defendants' net worth, whichever is less.

**COUNT IX**
**VIOLATION OF THE CALIFORNIA CONSUMER CREDIT REPORTING AGENCIES ACT (ON BEHALF OF PLAINTIFF MS. PRADO AND THE CALIFORNIA CLASS)**

371. Plaintiffs repeat and reallege the allegations in this complaint.

372. Ms. Prado brings this action under the California Consumer Credit Reporting Agencies Act, Cal. Civ. Code §§ 1785, *et seq.* ("CCCRAA") on behalf of herself and the California class members.

373. Ms. Prado and the members of the California class are consumers as that term is defined by Cal. Civ. Code § 1785.3(b).

374. In the regular course of its business operations, Wells Fargo routinely furnishes information to credit reporting agencies pertaining to transactions between Wells Fargo and its

consumers, so as to provide information as to a consumer's credit worthiness, credit standing, and credit capacity.

375. This action concerns Wells Fargo's furnishing of false derogatory information on Ms. Prado's consumer credit report, as defined by Cal. Civ. Code § 1785.3(c).

376. Specifically, Wells Fargo furnished the information to the credit reporting agencies, as defined by Cal. Civ. Code § 1785.3(d), that Ms. Prado's mortgage loan account was in forbearance, when Ms. Prado did not request or consent to the forbearance.

377. Wells Fargo's reporting is misleading because it implies that Ms. Prado requested the forbearance when she did not.

378. Further, Wells Fargo failed to provide information relating to payments Ms. Prado made and did not decrease the principal balance owed on the loan, falsely reporting a larger amount due on Ms. Prado's mortgage loan account on her credit report.

379. Wells Fargo, its agents, subsidiaries, and partners are "persons" as defined by Cal. Civ. Code § 1785.3(j).

380. Wells Fargo furnished and continues to furnish information it knows is false, incomplete, misleading, and inaccurate in violation of Cal. Civ. Code § 1785.25(a).

381. The foregoing acts and omissions constitute numerous and multiple violations of the CCCRAA.

382. As evidenced above, Wells Fargo's violation of the CCCRAA is willful.

383. As a result of each and every violation of the CCCRAA, Ms. Prado and the California class members are entitled to damages, attorneys' fees, and costs pursuant to Cal. Civ. Code § 1785.31(a)(1) and Cal. Civ. Code § 1785.31(d); punitive damages of not less than $100.00

and up to $5,000.00 per willful violation of Cal. Civ. Code § 1785.25(a) pursuant to Cal. Civ. Code § 1785.31(a)(2)(B); and equitable and injunctive relief pursuant to Cal. Civ. Code § 1785.31(b).

## COUNT X
## VIOLATION OF THE CALIFORNIA ROSENTHAL ACT
## (ON BEHALF OF PLAINTIFF MS. PRADO AND THE CALIFORNIA CLASS)

384. Plaintiffs repeat and reallege the allegations in this complaint.

385. Wells Fargo is a "debt collector" as that term is defined under the Cal. Civ. Code § 1788.2(c) because it collects, in the ordinary course of business numerous debts and payments from consumers.

386. This matter involves money, property, or their equivalent, due or owing or alleged to be due or owing from a natural person by reason of a consumer credit transaction. As such, this action arises out of a "consumer debt" and "consumer credit" as those terms are defined by Cal. Civ. Code § 1788.2(f).

387. As discussed above, Ms. Prado entered into a consumer credit transaction, as that term is defined by Cal. Civ. Code § 1788.2(e), involving an extension of credit pertaining to her mortgage loan.

388. Wells Fargo placed Ms. Prado and the California class members' mortgage loans into forbearance status without their consent.

389. Further, Wells Fargo continued to keep Ms. Prado and the California class members' mortgage loans in forbearance status, despite Ms. Prado and the members of the California class continuing to make their monthly mortgage payments. Upon information and belief, Wells Fargo failed to apply these payments towards the outstanding principal and interest on Ms. Prado's and the California class members' mortgage loan accounts.

390. Wells Fargo made representations that it will not place individuals into forbearance status without a consumer request, yet it placed Ms. Prado's and the California class members' mortgage loan accounts into forbearance without their knowledge or consent.

391. As such, Wells Fargo violated 15 U.S.C. §§ 1692e, 1692e(2)(A), 1692e(5), 1692e(10), and 1692f, which are incorporated into Cal. Civ. Code § 1788.17, for making misrepresentations regarding forbearance, placing consumers into forbearance without their knowledge or consent, and attempting to extend consumers' forbearance periods without their knowledge or consent.

392. Wells Fargo also falsely communicated to the credit reporting agencies that Ms. Prado's and the California class members' mortgage loan accounts were in forbearance, in violation of 15 U.S.C. § 1692e(8), which is also incorporated in Cal. Civ. Code § 1788.17. Wells Fargo's false communications with third parties regarding Ms. Prado's and the California class members' accounts, and the amount still due and owing, were also false under §§ 1692e, 1692e(2), 1692e(5), and 1692e(10), which are incorporated in Cal. Civ. Code § 1788.17.

393. Wells Fargo continued to collect the monthly mortgage fees, despite placing Ms. Prado's mortgage loan account into forbearance and failing to apply those funds to her mortgage loan account.

394. Ms. Prado and the California class members seek statutory damages, attorneys' fees, and costs pursuant to Cal. Civ. Code § 1788.30.

## COUNT XI
## (BREACH OF CONTRACT)

395. Plaintiffs repeat and reallege the allegations in this complaint.

396. The notes and deed of trusts and/or mortgages for the Plaintiffs' mortgage loans constitute valid contracts between Plaintiffs and the owners of their loans.

397. Plaintiffs tendered performance according to the terms of the contracts.

398. Defendants breached the Plaintiffs' mortgage loan contracts by placing them into forbearance status without Plaintiffs' consent.

399. Defendants also breached the Plaintiffs' and other class members' mortgage loan contracts by placing borrowers' mortgage payments into suspense accounts instead of applying funds received according to the payment application provisions of such borrowers' mortgage notes and deeds of trusts/ mortgage

400. Plaintiffs have incurred actual damages and attorneys' fees as a result of Defendants' breaches of their mortgage loan contracts.

401. Plaintiffs are entitled to recover their actual damages and attorneys' fees for Defendants' breaches of their mortgage loan contracts, and request that the Court award the same.

## COUNT XII
### (GROSS NEGLIGENCE)

402. Plaintiffs repeat and reallege the allegations in this complaint.

403. In a mortgagor-mortgagee relationship, a lender owes a borrower the duty to exercise reasonable care to avoid a foreseeable risk of injury to the borrower. *Hurd v. BAC Loan Servicing, LP*, 880 F. Supp.2d 747, 763 (N.D. Tex. 2012) (citing *Thrash v. Ocwen Loan Servicing, LLC*, 433 B.R. 585, 598-97 (Bankr. N.D. Tex. 2010). *See also Lukasik v. San Antonio Blue Haven Pools, Inc.*, 21 S.W.3d 394, 403 (Tex. App.—San Antonio 2008, no pet.)(citing *El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex. 1987)(Every person has a duty to exercise reasonable care to

avoid foreseeable risk of injury to others.)); *Trevino v. HSBC Mortgage Services, Inc. (In re Trevino)*, 535 B.R. 110, 150-151 (Bankr. S.D. Tex. 2015).

404.    By knowingly placing borrowers' loans into forbearance status without their consent, Defendants demonstrated an utter disregard of prudence amounting to complete neglect of the safety and financial welfare of the Plaintiffs and the other class representatives. Wells Fargo's misconduct is such a degree of negligence as would shock any fair-minded person. *Ferguson v. Ferguson*, 212 Va. 86, 92, 181 S.E.2d 648, 653 (1971) (emphasis omitted).

405.    Alternatively, or additionally, Wells Fargo acted with willful and wanton negligence, with conscious disregard or reckless indifference, to Plaintiffs' and the other class members' rights by placing Plaintiffs' and other class members' mortgage loans into forbearance status without their knowledge or consent.  Wells Fargo knew from its knowledge of existing circumstances and conditions, as reflected by its own website and published materials and its own institutional knowledge regarding how the credit markets would function and the effect a forbearance notation would have on consumers' credit, that its conduct probably would cause injury to Plaintiffs and the other class members. *Woods v. Mendez*, 265 Va. 68, 76-77 (2003).

406.    As a result of Wells Fargo's conduct as described herein, Plaintiffs have been damaged, including the cancellation of Plaintiff Forsburg's mortgage modification, credit damage, loss of access to credit markets and/or home equity lines of credit, reputational damage, frustration, outrage, and various out-of-pocket costs and other pecuniary damages and general damages.

**COUNT XIII**
**(DEFAMATION)**

407.    Plaintiffs repeat and reallege the allegations in this complaint.

408. Wells Fargo furnished information to credit reporting agencies TransUnion, Experian, and Equifax that it knew to be false, namely that the loans of Ms. Doctor and the Castros were in forbearance status and that it had no data regarding payments that Wells Fargo actually received and applied to the mortgage loan accounts of Ms. Doctor and the Castros.

409. Wells Fargo acted with malice or willful intent to injure Ms. Doctor and the Castros when it knowingly reported false information to the credit reporting agencies indicating that the loans of Ms. Doctor and the Castros were in forbearance status and that Wells Fargo had no data regarding payments Wells Fargo actually received from and applied to the mortgage loan accounts of Ms. Doctor and the Castros.

410. The Castros and Ms. Doctor directly informed Wells Fargo that they did not want their loans to be in forbearance status.

411. Wells Fargo knew that neither the Castros nor Ms. Doctor requested to have their loans placed into forbearance status.

412. Wells Fargo knew that it had received and applied the Castros' and Ms. Doctor's mortgage payments when it reported to the credit reporting agencies that it had "no data" regarding payments made by the Castros and Ms. Doctor during the time when Wells Fargo placed the Castros' and Ms. Doctor's accounts into forbearance status without their consent.

413. Wells Fargo continued to report to the credit reporting agencies that the accounts of the Castros and Ms. Doctor were in forbearance status and that Wells Fargo had no data regarding payments received during the time when Wells Fargo was reporting the loan as being in forbearance, even after being informed by the Castros and Ms. Doctor that their respective

accounts were being improperly reported as being in forbearance status and that the payments that the Castros and Ms. Doctor had made were not reflected on their credit reports.

414.    After the Castros informed Wells Fargo that they did not want their loan to be in forbearance status, and despite Wells Fargo receiving the Castros' payments during the original forbearance period, Wells Fargo unilaterally extended the forbearance period for the Castros' loan and continued to report to the credit reporting agencies that the Castros' loan was in forbearance status and that it had no data about the payments that Wells Fargo was receiving from the Castros each month.

415.    Upon information and belief, Wells Fargo also falsely reported to Fannie Mae and/or the Fannie Mae Trust (and by extension, Wells Fargo reported to the investors in the Fannie Mae Trust) that the Castros' loan was in forbearance status when Wells Fargo was receiving the Castros' payments and was actually aware that the Castros did not want their loan to be treated as being in forbearance status.

416.    The Castros have been unable to refinance their mortgage loan because of Wells Fargo's knowingly false reporting to the credit reporting agencies that their mortgage loan account was in forbearance status and because Wells Fargo reported to the credit reporting agencies that Wells Fargo had no data regarding the Castros' payments during the period when Wells Fargo treated the Castros' loan as being in forbearance without the Castros' consent.

417.    Ms. Doctor was unable to obtain a line of credit or loan against the equity in her home from her credit union because of Wells Fargo's knowingly false reporting to the credit reporting agencies that her mortgage loan account was in forbearance status and because Wells Fargo reported to the credit reporting agencies that Wells Fargo had no data regarding Ms.

Doctor's payments during the period when Wells Fargo treated Ms. Doctor's loan as being in forbearance.

418.     Plaintiffs and the class members are entitled to actual and exemplary / punitive damages as a result of Wells Fargo's publication of false defamatory statements about them.

## COUNT XIV
## (ATTORNEYS' FEES)

419.     Plaintiffs repeat and reallege the allegations in this complaint.

420.     Through the conduct described herein and as set forth above, Wells Fargo has inflicted actual damages upon Plaintiffs in a variety of ways.

421.     Moreover, Plaintiffs have been forced to retain legal counsel, who has incurred reasonable and necessary attorneys' fees on their behalf.  Such fees are properly taxed against Wells Fargo by virtue of Wells Fargo's violations of RICO, RESPA, the FCRA, Virginia Civil Conspiracy, Texas Debt Collection Act, Florida Consumer Collections Practices Act, and for its liability to Plaintiffs resulting from its fraud and/or gross negligence and breaches of contract. The Court may, and on these facts the Court should, award Plaintiffs their attorneys' fees as against Wells Fargo pursuant to the Court's inherent authority.

## VII.  REQUEST FOR DECLARATORY RELIEF

422.     Plaintiffs repeat and reallege the allegations in this complaint.

423.     As outlined in the preceding counts and the preceding factual allegations, Wells Fargo has violated the CARES Act, TILA, FCRA, RESPA, Virginia Civil Conspiracy (Statutory and Common Law), FCCPA, TDCA, and RICO.

424.     Particularly with respect to the CARES Act, which does not provide an independent private right of action for borrowers whose loans are impacted by servicer misconduct

in violation of the CARES Act's express requirements, a Declaratory Judgment confirming the unlawful nature of Wells Fargo's placement of borrowers' loans into CARES Act forbearance without their consent is necessary to protect other borrowers against similar, future violations by Wells Fargo and to put other mortgage servicers on notice that the kind of conduct outlined herein is unlawful.

## VIII.  REQUEST FOR PRELIMINARY INJUNCTION

425.    Plaintiffs repeat and reallege the allegations in this complaint.

426.    Pursuant to Fed. R. Civ. P. 65, Plaintiffs and the class are entitled to a preliminary injunction enjoining Wells Fargo from engaging in the acts and practices described herein, including:

- Placing borrowers' loans into forbearance status without authorization from the borrowers.

- Canceling any loan modifications in progress or completed prior to placing loans into forbearance status without borrower authorization.

- Communicating to any credit reporting agency, GSE, or other third party that a borrower's loan is in forbearance status unless the borrower authorized placement of the loan into forbearance.

- Foreclosing on any borrower whose loan was placed into forbearance status without authorization so long as this case is pending.

- Sending false and misleading communications to class members regarding the status of their mortgage loans.

427.    Plaintiffs assert that Wells Fargo will continue to wrongfully treat loans as being in forbearance and/or will place loans into forbearance status without the consent of the borrowers on such loans, in direct violation of the requirements of the CARES Act and in breach of borrowers' mortgage loan agreements.

428.    There is a substantial likelihood that Plaintiffs will prevail on the merits, as numerous courts and regulators have already sanctioned Wells Fargo for similar misconduct. *See* **Appendix 1**.

429.    The harm faced by the Plaintiffs and the class outweigh any "harm" that will be sustained by Wells Fargo if the preliminary injunction were granted.  The summary of some of the panoply of the harms to borrowers (and to the integrity of the financial system) caused by Wells Fargo's misconduct is described above.  These harms far outweigh Wells Fargo's interest in profiting and/or minimizing losses by illegally placing borrowers' loans into forbearance status.

430.    Issuing a preliminary injunction will not adversely affect the public interest but rather will enhance it.  Wells Fargo's actions flout the clear requirements of the CARES Act, and make a mockery of the integrity of the credit markets, GSEs' mortgage backed investment trusts, and other fundamental aspects of financial systems, as well as the good faith market participants who rely upon its transparency to make informed decisions. Wells Fargo's actions broadcast (again) its perception that it has impunity for conduct that overtly disobeys the provisions of the laws of the United States. Wells Fargo's actions erode public confidence in the rule of law and the integrity of our free markets, which depend on participants, especially major national banks like Wells Fargo, playing by the rules and not making up rules as they go along according to what seems convenient.

431.    The public has the right to expect that the courts will not condone contemptuous disregard for the laws of the United States and will act to appropriately sanction bad faith actors who cause harm to the economy and especially to individual consumers who have done nothing wrong. Even though the Court should balance the threatened injury to Plaintiffs against any harm to the defendant, when balancing the hardships of the public interest against a private interest, the public interest should receive greater weight. *See FTC v. World Wide Factors*, 882 F.2d 344, 346-47 (9th Cir. 1989). The substantial adverse effects of Wells Fargo's unauthorized mortgage forbearances militate strongly in favor of this Court issuing a preliminary injunction.

432.    The posting of a bond is not a prerequisite to the issuance of a preliminary injunction in this case because Wells Fargo cannot demonstrate that preserving the status quo will cause it cognizable economic harm. *See FTC v. Southwest Sunsites, Inc.*, 665 F. 2d 711, 714 n.1 (5th Cir. 1982) (ruling that a temporary restraining order or preliminary injunction may be granted without bond). Wells Fargo's unauthorized placement of borrowers' loans into forbearance alters the status quo. The Plaintiffs and class members were in the status quo when they were paying their mortgages in the ordinary course. The status quo is the mortgage loan contract, and since the Plaintiffs and class members have demonstrated no desire to modify the status quo, the posting of security is unnecessary.

433.    In addition, or alternatively, the Court can issue a preliminary injunction to prevent Wells Fargo from taking the actions Plaintiffs and the class seek to enjoin based on its inherent authority. Plaintiffs and class members have alleged that Wells Fargo is engaging in brazen violations of clearly articulated and duly ratified law of the United States, as embodied in the

CARES Act, and the preliminary injunction is simply a directive of the Court seeking to ensure that such violation(s) cease and that the status quo contemplated by the CARES Act be restored.

434.    Plaintiffs ask the Court to set this application for preliminary injunction for hearing if the parties are unable to agree to a preliminary injunction and, after hearing the request, issue a preliminary injunction against Wells Fargo enjoining it from the actions set out above.

## IX. REQUEST FOR PERMANENT INJUNCTION

435.    Plaintiffs repeat and reallege the allegations in this complaint.

436.    Plaintiffs and the class are entitled to an injunction permanently enjoining Wells Fargo from engaging in the acts and practices above as to any person who is a member, or could become a member, of the class of persons described in this suit.

## X. DEMAND FOR JURY TRIAL

437.    Plaintiffs repeat and reallege the allegations in this complaint.

438.    Plaintiffs and the class request a jury trial for any and all counts contained herein for which a trial by jury is permitted by law.

## PRAYER

**WHEREFORE, PREMISES CONSIDERED,** Plaintiffs respectfully pray that Defendants be cited to appear and answer these allegations and that, upon final trial of this cause, they be granted all relief to which they are justly entitled, including:

a.    Certification of the nationwide class and the subclasses of borrowers that were placed in mortgage forbearances by Defendants without the borrowers' authorization or consent;

b.    All actual damages, including attorneys' fees and costs (at trial and on appeal) to which Plaintiffs are entitled;

    c.        All compensatory damages to which Plaintiffs are entitled, including attorneys' fees and costs, as well as exemplary damages, and/or punitive damages, treble damages, and sanctions for Defendants' actions as described herein;

    d.        An injunction preventing Defendants from engaging in the conduct described herein and requiring Defendants to obtain authorization from borrowers before placing borrowers in a mortgage forbearance;

    e.        A declaratory judgment confirming the unlawful nature of Wells Fargo's unauthorized placement of borrowers' loans into and/or unauthorized extension of CARES Act forbearance; and

    f.        All such other and further relief as this Court may deem just and proper.

Respectfully submitted,

|  |  |
|---|---|
| | */s/ Theodore O. Bartholow, III ("Thad")* |
| | Theodore O. Bartholow III ("Thad") |
| Malissa L. Giles | Texas State Bar No. 24062602 |
| Tracy Giles | Karen L. Kellett |
| Giles & Lambert, PC | Texas State Bar No. 11199520 |
| PO Box 2780 | O. Max Gardner III |
| Roanoke, VA 24001 | N.C. State Bar No. 6164 |
| Tel: (540) 981-9000 | KELLETT & BARTHOLOW PLLC |
| mgiles@gileslambert.com | 11300 N. Central Expressway, Suite 301 |
| | Dallas, TX 75243 |
| Abelardo Limon, Jr. | Tel.: (214) 696-9000 |
| Texas State Bar No. 1235770 | Fax: (214) 696-9001 |
| Limon Law Office P.C. | thad@kblawtx.com |
| 890 W. Price Road | kkellett@kblawtx.com |
| Brownsville, TX 78520 | maxgardner@maxgardner.com |
| Tel: (956) 544-7770 | |
| Fax: (956) 544-4949 | *Attorneys for the Plaintiffs* |
| alimon@limonlaw.com | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on the parties listed below via ECF notification and/or electronic mail on April 14, 2022.

*/s/ Theodore O. Bartholow, III ("Thad")*
Theodore O. Bartholow, III ("Thad")

William C. Mayberry
Troutman Pepper Hamilton Sanders LLP
301 South College Street, Suite 3400
Charlotte, NC 28202
bill.mayberry@troutman.com

John C. Lynch
Troutman Pepper Hamilton Sanders LLP
222 Central Park Ave., Suite 2000
Virginia Beach, VA 23462
john.lynch@troutman.com